IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| PAUL J. CASTRO,<br><br>      Plaintiff,<br><br>v.<br><br>DAVID GOGGINS,<br><br>      Defendant. | Case No. 1:16-cv-10 |

## COMPLAINT

The Plaintiff, complaining of the Defendant, alleges and says:

## PRELIMINARY STATEMENT

Paul Castro is a highly respected professional writer who has written over 40 full-length screenplays over the past two decades. In 2008, he entered into a contract with David Goggins to write a movie and book about Goggins' life. Goggins expressly gave Paul exclusive rights to his personal story.

Over the next seven (7) years, Paul wrote and rewrote multiple versions of the movie, culminating in a final script approved by Goggins. Paul invested substantial time and his own financial resources into the venture. He recruited a world-renown star to play Goggins in the movie, along with a premier team that included a producer and cinematographer. In February of 2015 – when all of the major pieces were in place to begin shooting the film just five (5) months later – Goggins backed out of the deal, in breach of the parties' agreement.

Unbeknownst to Paul, Goggins' breach was the culmination of a relationship between Goggins and New York entrepreneur Jesse Itzler that spanned a period of at least seven (7) years.

In 2008, Goggins and Itzler had reached an agreement to market and sell athletic clothing using "evil" as a brand name. Itzler even took steps to trademark the name, before the venture was abandoned. Itzler also approached Goggins with other business ventures. In early 2015, Itzler authored a book – *Living with a SEAL* – that falsely suggests that he knew little about Goggins prior to inviting Goggins to live with his family, fails to mention that Itzler's personal and business relationship with Goggins had actually spanned for years, and misrepresented numerous facts about their time together. In a brilliant marketing ploy, Goggins and Itzler disguised their multi-year relationship to produce a profitable book venture, the profits from which they now share. The book, the marketing ploy, and the subsequent joint promotional book tour were made possible only by Goggins' breach of his agreement with Paul. This lawsuit seeks fair compensation for that breach.

## PARTIES AND JURISDICTION

1. Plaintiff PAUL J. CASTRO (hereinafter "PAUL") is a citizen and resident of Alamance County, North Carolina.

2. Upon information and belief, defendant DAVID GOGGINS (hereinafter "GOGGINS") is a citizen and resident of Williamson County, Tennessee.

3. This case is a civil action where the matter in controversy exceeds $75,000. PAUL is a citizen of North Carolina and GOGGINS is a citizen of Tennessee. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

4. This action arises out of breach by the Defendant of an agreement between the Plaintiff and the Defendant. Under the terms of the agreement described herein, the Plaintiff was to perform services – and did in fact perform services – within the State of North Carolina for the Defendant, which services were authorized and ratified by the Defendant. This Court therefore

has personal jurisdiction over the Defendant pursuant to N.C Gen. Stat. § 1-75.4 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

5. The Plaintiff performed a substantial part of his obligations under this agreement while in the Middle District of North Carolina and thus a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Middle District of North Carolina. Venue therefore is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTS

6. The Plaintiff realleges and incorporates herein the allegations in paragraphs 1 through 5.

7. PAUL is a highly respected professional writer and Writers Guild of America member who has written over 40 full-length screenplays over the past two decades, along with many television one-hour dramas. PAUL has worked with major studios, independent producers, Oscar winning movie stars and production companies in Los Angeles, New York and London. PAUL graduated from the prestigious University of California, Los Angeles (UCLA) School of Theater, Film, and Television (TFT), and received a Master of Fine Arts (MFA) in Film from UCLA with advanced study in screenwriting. PAUL's long list of accomplishments include the creation and sale of an original screenplay which became a Warner Bros. hit feature film starring Robin Williams, Jonathan Reese Myers, Kerri Russell, Terrence Howard, and Freddie Highmore.

8. Following the terrorist attacks of September 11, 2001, PAUL volunteered to serve in the United States Navy, where he was assigned to serve the Navy SEALs as a public affairs officer. In that role, PAUL became acquainted – and developed a close friendship with – defendant GOGGINS.

9. Defendant GOGGINS is a former Navy SEAL who has gained fame and notoriety for his performance as an ultramarathon runner, ultra-distance cyclist, and triathlete. In 2008, GOGGINS and PAUL entered into an agreement ("the Agreement"), pursuant to which PAUL would write a feature film about GOGGINS' life story, with PAUL serving as the sole screenwriter. In a handwritten agreement dated October 15, 2008, GOGGINS and PAUL agreed as follows: "This confirms that Paul Castro and David Goggins will partner on the feature film project about David Goggins' life story. Paul Castro will be the sole screenwriter."

10. Pursuant to the Agreement, PAUL wrote a script for a movie about GOGGINS' life, initially entitled "The Ultra One." GOGGINS provided a copy of the script to Jesse Itzler ("Itzler"), a New York based entrepreneur who was at that time the co-founder of Marquis Jet Partners. Itzler had a personal and business interest in ultramarathon running and had developed a relationship with GOGGINS. In October of 2008, Itzler contacted PAUL to discuss the movie that PAUL had written about GOGGINS.

11. Upon information and belief, notwithstanding the Agreement, by late 2008 GOGGINS and Itzler already planned to enter into a business relationship. PAUL's script of the movie – which had been provided to Itzler – contained the observation by a character that "evil spelled backwards is live." GOGGINS was fascinated with the concept of "evil." He wore clothes marked "evil" and wished to create a business venture in which the word "evil" was a prominent focus. Itzler shared this goal with GOGGINS. In early February of 2009, Itzler applied for registered trademarks for a family of marks containing the word "evil." Itzler applied for trademarks in "Evil Athletics," "Evil Endurance," "Evil Running," "Evil Basketball," "Evil Performance," "Evil Conditioning," and "Evil is Good." In his applications, Itzler stated that he intended to use the marks in connection with the sale of various articles of athletic clothing.

GOGGINS and Itzler intended to go into business together, using the applied for marks. Itzler also recruited GOGGINS to join him in a clothing business to operate under "the100mileman" brand, for which Itzler secured trademarks beginning in 2006.

12. Oblivious to GOGGINS and Itzler's plans, in early 2009 PAUL asked GOGGINS about entering into a more detailed memorialization of the Agreement. GOGGINS agreed to do so, but added, "I'm in no hurry because we have a signed paper and I gave you my word about the movie." On March 3, 2009, GOGGINS told PAUL that he needed to focus more time on the upcoming "Race Across America," an annual biking endurance sports event. GOGGINS emphasized, however, his commitment to the movie. "Please don't think this is me changing my mind about the movie," GOGGINS wrote. "I gave you my word and I think by now you should know that I will stick to it." GOGGIN never in fact participated in the "Race Across America."

13. With GOGGINS' reassurance and avowed commitment, PAUL continued to move forward to aggressively prepare the script for production. By May of 2009, PAUL had identified an Oscar nominated African American movie star who wanted to play the role of GOGGINS in the movie, which had by this date been renamed "Running with God." PAUL had also recruited a top-level producer to work on the project.

14. GOGGINS, however, was annoyed that famed actor Willard Carroll "Will" Smith, Jr. had declined to play the role of GOGGINS in the movie. In addition, GOGGINS believed that some of the facts about GOGGINS' life set forth in the script needed to be changed. When, in July of 2009, GOGGINS informed PAUL that he wanted PAUL to make these changes, PAUL readily agreed. As PAUL stated, "If this is your story then of course I want you to feel good about it." GOGGINS replied, "If you are willing to make changes I will be good with the movie."

- 5 -

Case 1:16-cv-00010-WO-JLW   Document 1   Filed 01/08/16   Page 5 of 12

15. Despite PAUL's willingness to make the changes GOGGINS requested, on October 10, 2009 GOGGINS abruptly and unexpectedly attempted to terminate the agreement. "So far as I'm concerned this is over," he told PAUL.

16. In late 2011, GOGGINS and PAUL resumed their business and personal relationship. In a January 8, 2012 email to PAUL, GOGGINS wrote, "I'm glad we as men can move past bull!" On January 9, 2012, GOGGINS reiterated his earlier concern about changes he felt should be made to the script. GOGGINS wrote, "I would like to talk about making it more about what really happened. I know you would have to do your thing in some spots. My life to me was and is very hard and I didn't have a lot of help along the way. So many people know my real story and I'm very proud of how I made it. I truly understand if you want to just say fuck it and not do the script at all. Whatever happens I'm very glad we talked again. You put a lot of work into my script last time and I was so happy that you would take time write about me. I should have been more open in the beginning. All I had in my life was God and when I went away from that I became an ass. I'm still an ass just to those that need it. You Paul didn't need it, you were trying to sell us as a team. I just wanted my real story. . . ."

17. Between early 2012 and late 2014, PAUL continued to revise and refine the script for the GOGGINS movie, producing dozens of versions of the script. On December 19, 2014, PAUL asked GOGGINS, "David are we a go with this screenplay?" GOGGINS replied, "I love it we are all done !!!!!!" With this, GOGGINS had approved the final script for "Running with God."

18. In addition to finalizing the script, PAUL continued to do other work necessary for the film's successful production, drawing upon his expertise and extensive network of entertainment industry professional relationships. PAUL recruited a top notch producer and one of the best cinematographers in the industry. Paul also obtained a $12 million funding commitment for the movie's production. PAUL arranged for the creation of a budget for the

film, of an analysis of tax credit opportunities, and of a shooting schedule. PAUL personally advanced certain expenses necessary to accomplish these tasks.

19. In preparation for filming of the movie, PAUL sought GOGGINS' reassurance that he would abide by the Agreement between the parties and that PAUL would have the exclusive right to write and direct any film about GOGGINS' life, as well as any book about his life. On February 18, 2015, GOGGINS provided this reassurance, stating: "To Whom It May Concern: Let this serve as a legal document confirming that writer-director Paul Castro is the only person that I grant the right to write and direct the feature film version of my life story and the book version as well. This includes the portrayal of Jackie Goggins Gardner, my mother and her life represented in my story. In my absence, I grant Jackie Goggins Gardner the authority to make any necessary decisions. Any changes to the screenplay or the book must be first granted permission by me, David Goggins in writing. A more detailed version of this document is to come. This letter serves as confirmation that Paul Castro is the only person I grant permission to bring my life story to the world via feature film and/or book. Also, Paul Castro is the only person directing my movie!"

20. With this reassurance in hand, PAUL continued to aggressively prepare the film for its scheduled shooting in July of 2015. In late February, PAUL traveled from North Carolina to Los Angeles for a February 25th meeting at which GOGGINS and the other members of the team assembled by PAUL were in attendance, including a prominent film and television star recruited by PAUL. All of the critical pieces were in place for the successful production of the film.

21. Despite all of the work performed by PAUL and by the team that PAUL assembled, immediately after the February 25th meeting, GOGGINS refused to move forward with the venture.

22. PAUL performed all of the obligations required of him under the Agreement. In fact, he continued to aggressively promote GOGGINS and to move forward with production of the film, notwithstanding PAUL's discovery that:

    a. Many of the slogans and expressions employed by GOGGINS and with which GOGGINS has become most known by the public were in fact appropriated by GOGGINS from others, without proper attribution;

    b. Despite GOGGINS' attempt to cultivate a public persona of honor and integrity, GOGGINS has for years resisted attempts to support his minor child, resulting just last month in an order against him for unpaid child support in a proceeding in Lake County, Illinois;

    c. GOGGINS has repeatedly misrepresented certain facts in his history and that of his family, including certain alleged health related incidents; and

    d. GOGGINS has repeatedly misrepresented the extent to which charities were in fact receiving the funds he claimed to be raising for them.

23. On November 3, 2015, Jesse Itzler published his book, *Living with a SEAL.* The book purports to recount Itzler's 31 days living with GOGGINS at Itzler's New York City home. The book contains and recounts information about GOGGINS' life, experiences, and history. At the November 3, 2015 launch party for the book, Itzler announced that Itzler and GOGGINS had an agreement, under which all proceeds from the sale of the book would be split between Itzler and GOGGINS. Since the publication of *Living with a SEAL*, Itzler and GOGGINS have made

numerous joint appearances to promote the book, including a national appearance on CBS This Morning.

24. Upon information and belief, GOGGINS knew at the time that he repudiated the Agreement that Itzler would publish his book *Living with a SEAL* and that GOGGINS would profit substantially from a new relationship with Itzler. This knowledge and desire to profit motivated GOGGINS to breach the Agreement.

25. Factual inconsistencies exist that raise doubts about the context and background of Itzler's book and therefore suggest: (a) that Itzler and GOGGINS have invented much of the relationship described in *Living with a SEAL* as a marketing ploy; and (b) that Itzler and GOGGINS have conspired to generate media frenzy by disguising their long-term business plans. These factual inconsistencies include:

    a. Itzler has stated in his book and in media appearances that he met GOGGINS at a twenty-four-hour relay race in San Diego. Itzler states he returned home after the race, tracked down a contact number for GOGGINS, and called GOGGINS cold. The following day, Itzler contends, he met with GOGGINS and invited him to live with him. GOGGINS "was at our breakfast table" about three days later, Itzler claims. In reality, GOGGINS did not run in a San Diego twenty-four-hour relay race after 2005. Thus, five (5) years elapsed between the time Itzler allegedly saw GOGGINS run and when Itzler says GOGGINS came to stay with his family. During this five (5) year interlude, Itzler and GOGGINS had frequent contact, as evidenced by Itzler's communications with PAUL in 2008 about GOGGINS. In fact, contrary to the story conveyed by Itzler, during this five (5) year interlude, Itzler and GOGGINS contemplated

and took steps towards the creation of a business to sell and market athletic clothing under the "evil" mark.

      b.      The very premise behind *Living with a SEAL* is fundamentally false. The book's author states that GOGGINS came to live with Itzler's family even though Itzler knew almost nothing about GOGGINS. In reality, by the time GOGGINS arrived at Itzler's house, Itzler had known GOGGINS for five (5) years, had discussed entering into a business relationship with GOGGINS using the "evil" mark (and had taken steps to obtain trademark rights to a family of such marks in furtherance of that plan), and had received PAUL's screenplay about GOGGINS and his life.

      c.      Itzler contends that GOGGINS stayed with his family for 31 days starting in December of 2010. GOGGINS, however, told PAUL that he only stayed at Itzler's house for a less than a week and could not do it anymore because "the whole thing was gay."

      d.      Only one of Itzler's tweets from December of 2010 mentions doing any of the activities described in *Living with a SEAL* as having occurred during that month.

      e.      Itzler's tweet from September 28, 2011 states that he hired GOGGINS "to live with me again for 30 days." *Living with a SEAL* does not mention that GOGGINS lived at Itzler's house on any other 30 day period.

26.      Upon information and belief, GOGGINS needed to attempt to terminate his contractual relationship with PAUL so as to pursue his relationship with Itzler. Itzler knew of GOGGINS relationship with PAUL and encouraged GOGGINS to attempt to terminate that relationship.

- 10 -

Case 1:16-cv-00010-WO-JLW   Document 1   Filed 01/08/16   Page 10 of 12

27. Shortly after publication of *Living with a SEAL* and the start of GOGGINS and Itzler's promotional tour, GOGGINS sent an email to PAUL claiming that he has "revoked any and all rights that may have been granted" to PAUL as referenced in GOGGINS' email on February 18, 2015. The email from GOGGINS to PAUL was copied to Marc Adelman. Adelman is a key executive and advisor to Itzler, and serves (or served) vital roles in many companies founded by Itzler (including 100 Mile Group, BrandFire, LLC, Coconut Water Investors LLC, and Pure Brands, LLC). GOGGINS' decision to copy Adelman on the email is explained by Itzler's complicity in GOGGINS' decision to breach the Agreement.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

28. The Plaintiff realleges and incorporates herein the allegations in paragraphs 1 through 27.

29. A valid and enforceable agreement existed between the Plaintiff and the Defendant, pursuant to which: (a) the Plaintiff would apply his knowledge, skill, and industry connections to write and produce a feature film about the Defendant's life; and (b) the Defendant would grant the Plaintiff exclusive rights to write and produce a film about the Defendant's life and to bring the Defendant's life story to the world via feature film and book.

30. The Plaintiff has complied with all requirements imposed upon him by this agreement.

31. The Defendant has repudiated the agreement, purporting to revoke without justification or cause the Plaintiff's rights thereunder and to withdraw his cooperation from the venture, all in breach of the agreement.

32. As a result of the Defendant's breach of its obligations under this agreement, the Plaintiff has suffered actual and consequential damages in an amount exceeding $75,000.

- 11 -

Case 1:16-cv-00010-WO-JLW   Document 1   Filed 01/08/16   Page 11 of 12

## PRAYER

WHEREFORE, the Plaintiff respectfully prays the Court:

1. For an award of damages against the Defendant in an amount greater than $75,000;

2. For costs and attorney's fees;

3. For a trial by jury as to all issues of fact; and

4. For such other and further relief as the Court may deem just and proper.

THIS THE 8th day of January, 2016.

**JERRY MEEK, PLLC**

By: /Gerald F. Meek/
GERALD F. MEEK
N.C. Bar Number 24930
5950 Fairview Rd., Suite 700
Charlotte, NC 28105
Telephone: 704.845.9490
Fax: 704.837.7056
jmeek@jerrymeek.com

Counsel for the Plaintiff

- 12 -

Case 1:16-cv-00010-WO-JLW   Document 1   Filed 01/08/16   Page 12 of 12