# EXHIBIT B

1    Q.   So 2012 to 2013 roughly?

2    A.   Around there.

3    Q.   Were you in Honolulu or --

4    A.   I was the big island.

5    Q.   Okay.

6    A.   -- or the main island.  Which one is it?

7  The main island?  Is that the one with all the

8  craziness going on there?

9    Q.   It's been a long time since I've been in

10 Hawaii so I'm not sure.

11   A.   Yeah.  I just kind of go somewhere -- but

12 it's records, I can get them.

13   Q.   And then prior to 2012, you lived in San

14 Diego.  When did you first arrive in San Diego?

15   A.   I was there quite a bit.  So I was in BUD/S

16 for three times so the story gets long and drawn out

17 now.  So I went to San Diego the first time in 2000 to

18 go through my first Navy SEAL training.  And then I

19 got injured, went back to Indiana for a second, went

20 back 2001, so pretty much from I would say from 2000

21 all the way until 2012, around there.

22   Q.   You were living in San Diego --

23   A.   Yeah.

24   Q.   -- roughly all the time?

25   A.   Roughly, roughly.

Case 1:16-cv-00010-WO-JLW   Document 38-2   Filed 05/15/17   Page 2 of 32

```
 1        Q.   Okay.
 2        A.   But about 12 years hardcore, you know.
 3        Q.   Sure.
 4        A.   Going through BUD/S, you know, it goes back
 5   and forth, you know.
 6        Q.   And when was it -- I assume it was in San
 7   Diego that you first met Paul Castro?
 8        A.   Uh-huh, yes, yes.
 9        Q.   Okay.
10        A.   I met Paul Castro in San Diego.
11        Q.   Okay.  How is it that you came to meet Paul
12   Castro?
13        A.   Well, Paul Castro I believe was a
14   reservist -- was an officer.  I don't know if he was a
15   reservist or not so I can't really speak about Paul.
16   But I was working in the PA -- I was pretty much the
17   head you of, you know, the SEAL teams.  I was the
18   poster child.  They had no black people in the SEAL
19   teams.  I was like around the 36th African-American to
20   become one in 70 years.
21              So they're looking for more
22   African-Americans to become SEALS.  Since, you know, I
23   was the guy already out there doing these long races
24   and I already had a lot of publicity, I was pretty
25   much a public figure before I went there so they hired
```

1    me to be a recruiter.

2         Q.  Okay.

3         A.  So I was a recruiter and I believe Paul was

4    a PAO, Public Affairs Officer.

5         Q.  So you were in the Navy by the time that you

6    first met Paul?

7         A.  Yes.

8         Q.  Okay.

9         A.  And so was he.

10        Q.  Prior to the Navy, had you served in the Air

11   Force?

12        A.  I did.

13        Q.  When did you serve in the Air Force?

14        A.  From '94ish to '98.  But then I went to the

15   reserves in the Air Force until almost '99 because at

16   that -- I'd have to look on my documents because then

17   I bleed over to the Navy.  So I'm in the Air Force and

18   I kind of get out of the Air Force.  I worked for a

19   job, Ecolab, spraying for cockroaches, and it bleeds

20   into the Navy.  All that period of time right there is

21   kind of just like of bled in so.

22        Q.  Okay.  Other than the Air Force and the

23   Navy, have you served in any other armed forces?

24        A.  I didn't serve, but I actually went through

25   Army Ranger School.  So I was the honor man -- I was

1  the enlisted honor man at Army Ranger School, class
2  0304.  As a matter of fact, I'm the only person in the
3  history of the military who did Air Force, TACP, Army
4  ranger and also the Navy SEALS.
5      Q.  Okay.
6      A.  So remember get that all there.  That's
7  important.
8          (A conference was held off the record.)
9      Q.  During what period of time were you at Army
10 Ranger School?
11     A.  I went to ranger school -- I was a winter
12 ranger so I was there '03, '04 so I went in 2003,
13 December, and I graduated 2004.  So I was there three
14 months.  In February I graduated, February 2004.
15 Winter ranger means that -- I was a Christmas ranger
16 so you go to the first phase -- ranger school was
17 three months or phases.  The first phase is in
18 Georgia, then you have like a little break in between
19 because I was a Christmas ranger.  So you go off for
20 like two weeks and get all fat and happy and then come
21 back and do your phase two and three.
22     Q.  But you have never actually -- other than
23 ranger school, you never actually served in the Army?
24     A.  I didn't serve in the Army, but actually as
25 an Air Force TACP, what happens is you are liaison to

1    the Army.  So I was stationed at Fort Campbell,
2    Kentucky.
3         Q.  Okay.
4         A.  And Fort Campbell Kentucky is an Army base.
5    I was stationed there for three and a half years.
6    Where I worked -- I was there, I was with an Army unit
7    for three and a half years so I was -- I wore an Air
8    Force uniform, but I was in the Army.
9         Q.  Okay.
10        A.  That's what they call us.
11        Q.  Okay.  When did you first have any
12   discussion with Paul Castro about doing a movie or
13   book or anything of that sort about your life?
14        A.  I believe it was 2008.  And I'm sorry, I'm
15   going to keep this slow.  It was 2008 when he came to
16   the PAO office.  And my job in the SEAL teams at the
17   time was, like I said, I was the -- I was the face of
18   the SEAL teams and they had me farmed out.  I traveled
19   200-some-odd days a year just telling my life story.
20   So I became a humongous public figure as far as like,
21   you know, my story was out there left and right.
22             And that's how Paul Castro heard my story.
23   He got sent over to the PAO office to help out because
24   we really were charging forward to get more people to
25   become Navy Seals, especially African-Americans.  He

1  heard my story and he became intrigued with who I am

2  as a person.

3      Q.  So in 2008, how do you recall the first

4  discussion of doing a movie or a book about your life

5  developing?  Did Paul raise the subject?  Did you

6  raise it?

7      A.  I didn't even know who Paul Castro was.

8      Q.  Okay.

9      A.  I didn't know he did movies I knew nothing

10 about Paul Castro.  So he obviously raised it to me

11 because I don't go around saying, hey, do you do

12 movies, do you do movies, do you do movies.  So I

13 didn't know who he was.  So basically Paul Castro came

14 to me, heard my story, gave me his complete resume

15 about who he was.

16     Q.  Okay.  Had you heard of for example the

17 movie August Rush?

18     A.  I never heard of it until he brought up what

19 it was.

20     Q.  Have you since seen that movie?

21     A.  Paul Castro wanted me to see it.  I saw it.

22 Let me look back.  He wanted me to see the movie, I

23 saw it then.  But, you know, I'm a Navy SEAL retired

24 guy, I ain't watching no guy that plays instruments

25 and stuff like that.

```
 1    it says exactly what it says, if it was my life story.
 2         Q.  Okay.  But you did agree that Paul Castro
 3    had the right -- you were giving him the right to
 4    write your life story?
 5              MR. SPENGLER:  Objection.
 6         A.  If we want to move forward on this, we can,
 7    but I'm going to continue giving you the same answer
 8    you're giving me.  I understand what you're saying.  I
 9    want you to understand that I'm saying.  I'll stay
10    here all day long.
11         Q.  Okay.
12         A.  I've already spent $70,000 on this stupid
13    case.  I'll stay here all day long.
14         Q.  How much, 70- or 17-?
15         A.  70-, 70-.
16         Q.  Okay.
17         A.  Roughly.  I want to make sure that's clear.
18    Roughly $70,000.
19         Q.  After Exhibit 1, was there further
20    discussion that you had with Paul Castro about
21    memorializing the agreement that the two of you had
22    regarding writing the movie?
23              MR. SPENGLER:  Objection.  Object to form.
24         Q.  Go ahead.
25              MR. SPENGLER:  Go ahead.
```

1    these people have to know my true story because this
2    is not it, this is not it.  So I wanted to hear these
3    experts hear my life story.
4            And we present this to them and Paul
5    explains to them how he got this.  Okay.  That's what
6    we agreed on.  We walk into this Overbrook meeting,
7    I'm sitting there, it's two males and a female.  And
8    as a matter of fact, her name is Tracey Nyberg, Tracey
9    Nyberg.  I got to remember her real quick.
10           So I'm sitting there and Paul just is in a
11   cold sweat, he's so excited.  Because why?  As a
12   screenwriter, you're in front of Overbrook now, man.
13   This is big time for Paul Castro.  So he's sitting
14   there, man, and he's selling this script, this script
15   that's 70 percent not my life.  He's selling this
16   thing like it's my life story.  And I'm sitting there
17   and I said probably five words.
18           And the only reason why I didn't embarrass
19   Paul Castro in that meeting was because it's the man
20   that I am.  I knew if I were to tell him in that
21   meeting that what you're saying and you're selling as
22   my life is not my life, that I would -- because that
23   was his job.  He was a screenwriter.  So I didn't want
24   to embarrass him in front of these people.
25           So anyway, we leave that meeting, I'm in

1   this car, I'm pissed off because my life means

2   something to me and he lied about my life.  Okay.  So

3   then I'm sitting there driving.  We go off, I don't

4   talk to him.  I go back to the hotel room and I'm

5   like, do you know what, this -- I got to find these

6   people, call them up and tell them my real life story.

7           So I call up Tracey Nyberg I think a day or

8   two later, I forget exactly, but there's an e-mail

9   that discusses that.  And I say, Tracey, in that

10  meeting, Paul Castro sold that script as my life, it's

11  not my life.  So for 45 minutes I told Tracey Nyberg

12  my true story.  Never heard from her again.  And also

13  I wrote Paul Castro an e-mail about what I did and

14  what went on.

15          And bottom line is that was when -- and I

16  think Paul Castro returned it, whatever, no big deal.

17  The bottom line is I told you what I did.  Phase one

18  ended right there.  So when he went into that meeting

19  and did not give my life story like we agreed to, my

20  word then was now gone because he did not do what he

21  said he was going to do.

22      Q.  When was that meeting with Overbrook, do you

23  recall roughly?

24      A.  I don't remember the exact date of that

25  meeting.  I can go through the e-mails and see when

1    I --

2         Q.   Do you remember which --

3         A.   -- e-mailed Paul.

4         Q.   Do you remember the month?

5         A.   I don't.

6         Q.   Okay.

7         A.   But the e-mails have it.

8         Q.   Before the meeting with Overbrook, had you

9    read a copy of the script?

10        A.   For sure, yes, I did.

11        Q.   And had you complained to Paul Castro about

12   the script in terms of -- and told him that you didn't

13   think it accurately conveyed events in your life?

14        A.   No.  Like I said, Paul Castro sold me on the

15   fact -- once again Paul Castro sold me on the fact

16   that these screenplays had to have a bunch of

17   make-believe fairytale in it.

18        Q.   Okay.

19        A.   So but what I do know for 100-percent fact

20   is that we discussed that when we walk into this

21   meeting, we will tell these people the true story of

22   my life so they understand it in its entirety.

23        Q.   Prior to the meeting at Overbrook, had you

24   ever expressed concern to Paul Castro that the script

25   that you reviewed did not accurately convey events in

1           THE WITNESS:  Roger that.

2           (A recess was taken.)

3      Q.  So as of the meeting with Overbrook,

4  Mr. Goggins, what outstanding issues with the script

5  existed that you wanted changed?

6      A.  There was a lot of things I wanted changed.

7      Q.  Okay.  Specifically what were they?

8      A.  For instance, the last race, the last race.

9  And like I said, I agreed to the script so these

10  changes that weren't made bothered me, but I went with

11  it because he was the expert.  So the whole last race

12  never happened.  The whole thing about Spencer Calvin

13  running with me in the last race, the BUD/S

14  instructor, he was never an ultrarunner.

15           The whole last race, the 205-mile race that

16  I did, I did around a one-mile track.  I never did it

17  in the desert.  I wanted that changed.  I never -- the

18  whole last scene of that movie, the whole last scene

19  never happened about me fireman's carrying some guy to

20  the finish line.  I never said anything about that in

21  my entire life.

22      Q.  But as of the meeting with Overbrook, you

23  weren't insisting on additional changes, were you?

24      A.  I wasn't insisting on additional changes,

25  but I was insisting on him knowing my life story.

1 fact, but, I mean, at the end of the day, you agreed

2 that the project could go forward with the script as

3 written?

4     A.  At the end of the day, I trusted him that

5 when we went to these people, we would tell them my

6 true life.  So yes, I agreed on the script, but I

7 trusted him that in this meeting, which is why both

8 meetings didn't work, because he didn't live up to his

9 end of the bargain, which was telling the true story.

10     Q.  And you responded to his e-mail and said,

11 "Love you my friend."  Right?

12     A.  Yeah, oh, yeah.  Once again, you're going to

13 see a bunch of great e-mails.  But after -- I want to

14 see the e-mails after the meeting.  That's what I want

15 to see.

16     Q.  Well, so, I mean, I'm trying to understand.

17 You were fine with the script as written, but you felt

18 like there should be some explanation to the people at

19 that meeting about the script?

20     A.  Yes.  So this is what I believe, this is how

21 I believed it, okay, that he sold me on the fact that

22 we had to do all of this Hollywood stuff, which I

23 never liked.  But once again, I mean, you trust

24 someone and he had and the experience.  He is the

25 writer, I am not.  I know nothing about the business.

1      Q.   So who do you know of -- as we sit here

2   today, who do you know of, who was at the dinner

3   meeting but wasn't at The Gersh Agency meeting?

4      **A.   Like I said, only people I remember at the**

5   **dinner that I can tell you is Boris Kodjoe, myself,**

6   **Paul Castro, my mom and Scott Gearen.**

7      Q.   Was Boris Kodjoe at The Gersh --

8      **A.   Yes, he was.**

9      Q.   Scott Gearen, was he at The Gersh Agency

10   meeting?

11     **A.   Yes, he was.**

12     Q.   Your mom was at The Gersh Agency meeting?

13     **A.   Yes, she was.**

14     Q.   Do you remember Lauren Selig being present

15   at either of those two meetings?

16     **A.   I know that Lauren was not at The Gersh**

17   **company meeting because I remember Gersh talking to**

18   **Paul and they were kind of lighting Lauren's butt up**

19   **about what she's not and what's she this so obviously**

20   **she's wasn't there.  I'm not for sure about the dinner**

21   **though.  I can't remember.**

22     Q.   Do you know whether Billy Badalato was at

23   either of those meetings?

24     **A.   I wouldn't known Billy Badalato.  I've never**

25   **met him.**

1      Q.  Do you remember meeting Lauren Selig?

2      A.  I know Paul talked about her a lot and I

3  think I may have met her quickly at the speaking gig.

4  I don't know if she had dinner or not, but I'm not

5  really for sure.  I know she talked about -- I know of

6  her.

7      Q.  At some time prior to the dinner, did Paul

8  Castro ask you to write a legal document just

9  indicating that he had the rights to write the

10  screenplay?

11      MR. SPENGLER:  Object to form, calls for a

12  legal conclusion.

13      A.  He asked me -- well, he actually -- it was a

14  letter.  He said that to have this meeting, David --

15  he was real frantic about it.  He kept talking and

16  talking, talking, talking about this letter, that he

17  needed this letter, needed before this meeting to show

18  people that we were trying to work together on

19  something.  So I know at this time he was trying -- so

20  he actually drafted some letter up and sent is it over

21  and my mom kind of did the rest.

22      Q.  Okay.  You knew, from prior communications

23  with Paul, that he needed to show some kind of

24  documentation to the third parties he was working with

25  to show that he in fact had the rights to do this.

1   At some point though, the letter that Paul requested
2   was sent, was it not?
3       A.   It was.
4       Q.   Okay.  Tell me how that came about.
5       A.   Oh, man.  It came about I was upstairs
6   working.  Like I say, I was going to go be wildlands
7   firefighter in a few months so I was kind of getting
8   packed up, getting ready to go.  And I was also
9   getting ready to go to California.  And my mom got
10  this e-mail and the e-mails says exactly what it says.
11  She says, hey, I got this e-mail from Paul.
12          It was sent to my e-mail, my mom checked it
13  out and I was upstairs doing work.  And Paul had sent
14  me so many e-mails this day wanting this e-mail back,
15  that I was too busy and I was like, hey, look at it,
16  if it doesn't sound stupid, because I'm not getting
17  into a legal agreement with Paul right now, I'm going
18  to wait until after this -- until after this doggone
19  thing.  And he kept talking this stuff.  I want to see
20  how he performs in this meeting that he performed so
21  horribly in the first time, which I'm going to have
22  people there with me.  And she wrote this.
23      Q.   Okay.  First of all, does your mother
24  typically check your e-mail?
25      A.   All the time --

```
 1          Q.   Okay.

 2          A.   -- if I'm not around or ask her to.

 3          Q.   And she testified that she responded and

 4   sent this e-mail with your authority.   Is that true?

 5          A.   If I told my mom to check something, I don't

 6   believe if it was my -- yeah, which I'm sure it was.

 7   She doesn't lie.

 8          Q.   She wasn't sending an e-mail without your

 9   permission?

10          A.   Yeah, she doesn't lie at all.

11          Q.   She had your permission to send the e-mail

12   that she sent, did she not?

13          A.   I'm not going to say she had my permission.

14   If it was my mother and she said that's what it was,

15   that's what it was.

16          Q.   Well, now, I want to know, did she have your

17   permission?   I mean, you told her to send the e-mail

18   that Paul was requesting, did you not?

19          A.   What I said was look at the e-mail, read it

20   over and then you use your best judgment on the

21   e-mail.

22          Q.   And you authorized her to send the e-mail --

23          A.   Obviously --

24          Q.   -- to Paul?

25          A.   -- if that's what I said.
```

1      Q.  Yes, at that point in time?

2      **A.  At that point in time.**

3      Q.  The answer is yes at that --

4      **A.  No.**

5      Q.  -- point in time he did?

6      **A.  At that point in time, yes.**

7      Q.  Okay.  And that only changed you said at the

8  meeting with The Gersh Agency?

9      **A.  Right.**

10     Q.  I want to talk about that meeting some more.

11     **A.  Good.**

12     Q.  Do you know why your mother edited the

13  letter that Paul Castro asked for?

14     **A.  I have no idea why she edited it.  Maybe**

15  **because she didn't like how it read.  I don't know.**

16     Q.  I'm sorry.  I don't understand what that

17  means.

18     **A.  If she -- if she edited it, she probably**

19  **didn't like how the letter was reading.**

20     Q.  I see.  I see.  I mean, you understand that

21  Exhibit 17 is different than the language contained in

22  Exhibit 16 in several respects?

23     **A.  Oh, yeah, I see that.**

24     Q.  Okay.  Have you ever had any discussion with

25  her about her decision to change the draft at any

1    A.   Like I say, there's a couple people in that

2    meeting and once again, in all honestly, under oath, I

3    do not remember the people.   I remember that one scene

4    because that's the one scene that really stuck in my

5    head about my saving someone's life.   Because why?   In

6    the military, I work with guys who save people's lives

7    and I haven't.

8         That one scene sticks out to me so much by

9    being a 21-year veteran of the military, that it just

10   was so -- and for somebody to say -- call me a hero

11   and call me great, I'm not that so that -- that's one

12   thing that stuck out to me.

13   Q.   But you knew about that scene going into the

14   meeting at The Gersh Agency and you approved it.

15   Right?

16   A.   Do you know what, I approved it be the fact

17   that we were going here -- trust me, in my eyes, in my

18   eyes, 100 percent under oath, that was not going to go

19   down.   That's why it's not going down.   So look, check

20   this out, is there a movie made right now?   If I

21   really agreed to everything in that script, if I

22   agreed to everything in that script both times, every

23   time, 26 times, whatever, it would have went down.

24   Q.   Not when you --

25   A.   Once again --

1  Diego at that time?

2  **A.  Yes, she was.**

3  Q.  And then after the two of you separated, did

4  she move to Illinois?

5  **A.  Indiana.**

6  Q.  Indiana?  To Brazil?

7  **A.  Yes, Brazil.**

8  Q.  Do you know how long she stayed in Brazil?

9  **A.  She's still there.**

10  Q.  When's the last time you've spoken with your

11  daughter Jade?

12  **A.  It was -- she reached out to me maybe six**

13  **months ago about a workout or something like that.**

14  Q.  And prior to that, when had been the last

15  time you'd spoken to her?

16  **A.  We don't speak too much.**

17  Q.  Over say the last five years, how many times

18  have you spoken to her?

19  **A.  Man, over 5 years, I would say 10, 12 tops.**

20  Q.  There was, as you know, an action brought in

21  Libertyville for child support by the state on behalf

22  of Ms. Pritchard.  What do you know about that?

23  **A.  That caught me way off guard because I never**

24  **missed a child support and I have all the records to**

25  **prove that, never missed one in my entire life.  So**

1    what it was -- I actually didn't find out about it
2    until I went to get a passport.  So I go to get a
3    passport and they deny me the passport.  And I was
4    like what's going on here and they said, well, you --
5    Illinois says this and -- so I'm not for sure what
6    really happened.
7          But I was retired from the military, Lee
8    wanted more money for child support I believe or she
9    was maybe scared that I was going to stop direct
10   deposit.  I'm not for sure.  And they had never
11   garnished my wages so like the military usually
12   garnishes your wages.  I had direct deposit set up
13   from the beginning of time with her so I don't know if
14   she got worried.  I don't know.  I can't speak for
15   her.
16         So something happened through Illinois that,
17   and Illinois was doing something with my wages.  They
18   said we're going to start garnishing your wages.  I
19   was like okay.  I really can't speak intelligently
20   about this because I don't even know what happened.
21   When I got out of the military, I started paying her
22   with checks.  Bottom line is I don't know.
23         I then called Indiana, you know, when I
24   didn't have my passport.  Indiana called Illinois.  I
25   guess they weren't talking to each other.  Because I

1    retired from the military, it -- honestly it baffled

2    me too.  It baffled me too.  And I have every single

3    document on paying for it.

4            As a matter of fact, for the first year, I

5    was supposed to pay $500 a month or -- $500 a month.

6    For the first year, we were divorced I paid $900 a

7    month and I was only ordered to pay 500.  I also paid

8    $13,000 for her schooling and I also paid for her car

9    so.

10       Q.   Well, when you indicated in 2015, that

11   you -- as a result of speaking engagements, that was

12   your best year ever and you made $95,000 off of 19

13   gigs.  Is that right?

14       A.   Uh-huh.

15       Q.   Correct?

16       A.   Yes.

17       Q.   Was child support modified in any way to

18   reflect the fact that you now made an additional

19   $95,000?

20       A.   It wasn't modified because whatever they ask

21   for, they get.  I've only turned my daughter down once

22   for anything.  Because my salary would go from -- so

23   that's the highest it was.  It was a standard like

24   $60-something-thousand, military guy.  So, you know,

25   it fluctuated.  But I never turned down them for

```
1    anything.
2         Q.  Have the payments been $500 a month; that
3    is, the court-ordered payments been $500 a month as
4    long as you can remember?
5         A.  Yeah, as long as I can remember.  I also
6    have a check here for $900-something that I just gave
7    this week.  Whatever they need, I pay.
8         Q.  But there was never any increase in the
9    monthly amount by virtue of the income that you made
10   outside of the military.  Correct?
11        A.  No, no.  She never brought me to court for
12   that or never --
13        Q.  Do you know if she was even aware of how
14   much money you were making outside the military?
15        A.  I have no idea if she's aware.  I mean, she
16   can definitely ask or definitely do what she's doing
17   now where she's trying to get more money.  That's up
18   to her so, you know.
19        Q.  When you say she's trying to get more money,
20   what do you mean?
21        A.  Like she wants more child support.
22        Q.  And when is the last time you've had any
23   communication with her about that subject?
24        A.  I don't communicate with her so we have
25   lawyers that do all that stuff.
```

1    Q.   There are attorneys.   Do you know who her

2    attorney is?

3         A.   I have no idea what her name is.

4         Q.   Is her attorney in Libertyville?

5         A.   Once again, Libertyville is Illinois.   She's

6    in Indiana.

7         Q.   Her attorney's in Brazil, Indiana?

8         A.   Right.   I'm not sure if it's in Brazil or

9    Terre Haute.   I'm not for sure.

10        Q.   Do you know if there was any pending action

11   in Indiana to try to get more child support?

12        A.   There should be pending action to get more

13   child support, but there's not pending action that I

14   haven't paid child support because I've never missed a

15   payment.

16        Q.   But you understand that the amount that

17   you're supposed to pay is based upon your income.

18   Right?

19        A.   Do you understand that the amount you're

20   supposed to pay is according to the document and if

21   you want more money, you take me to court and you get

22   more money?   That's how I understand it.

23        Q.   Is --

24        A.   I understand if a lawyer and judge says you

25   owe $500 a month and this person is not taking you to

1     court -- which she is now after 15 years and now she

2     may or may not.  She actually might get less money

3     now.  Who knows.

4          Q.  So in 2015, between your military income and

5     your speaking engagements --

6          A.  Uh-huh.

7          Q.  -- what was your total income that year

8     before taxes?

9          A.  I think I told you I think it was like

10    one -- whatever I said.  I'm not for sure.  I have to

11    look at my taxes.

12         Q.  You said --

13         A.  But let me ask you one question though.

14         Q.  You --

15         A.  Go ahead.  I'm sorry.

16         Q.  You said you made $95,000 off of just that

17    one Patriot Tour?

18         A.  Yeah.

19         Q.  And that's the one, but that's 19 gigs and

20    then you had military salary?

21         A.  Yup.

22         Q.  You had disability for part of 2015?

23         A.  I was in the military.

24         Q.  You were in the military so that didn't hit

25    until 2016?

```
 1        A.   Yup.  Can't get --
 2        Q.   What was your military salary in 2015?
 3        A.   For me to give you a good answer on that, I
 4   need to look at my tax paperwork, but I think it was
 5   about $60,000-something.
 6        Q.   So between speaking gigs and your military
 7   income, is it fair to say that you made at least 160
 8   grand in 2015?
 9        A.   I don't think it's 160-.  I'm not for sure.
10        Q.   You're not --
11        A.   I mean, yeah.  You can say what you want,
12   that's fine.
13        Q.   It would be 95,0000 for the Patriot Tour?
14        A.   Uh-huh.
15        Q.   You had another speaking event?
16        A.   Uh-huh.
17        Q.   Correct?  But you don't know how much you
18   made for that?
19        A.   No.
20        Q.   And then it was the military?
21        A.   Uh-huh.
22        Q.   So that takes you up to about 160,000,
23   doesn't it?
24        A.   That's fine.  I mean, it could be 400,000,
25   you know, whatever.
```

```
1          Q.   And you paid 500 a month in child support?
2          A.   Along with medical and dental and along with
3     whatever else they needed.
4          Q.   Was Jade on your medical policy through the
5     Navy?
6          A.   Has always been.  She's always been on it
7     since she was born until right now today, she still
8     is, medical and dental.
9          Q.   So that wouldn't have been an out-of-pocket
10    expense that you incurred, that's something the Navy
11    would incur.  Is that right?
12         A.   What do you mean.  No.  That's --
13         Q.   Do you pay the Navy for that coverage?
14         A.   Yeah, I pay that.  And my question real
15    quick is, I love these questions, but what does this
16    have to do with anything?  Like are you her attorney
17    for the case with her?
18         Q.   So when was the action brought to inform
19    Brazil or Indiana somewhere to modify the child
20    support payments?
21         A.   I'm not for sure.  You need to talk to my
22    lawyer about that because I knew I was paying, I knew
23    I was doing everything according to my divorce decree,
24    never missed anything or part of it versus paying
25    this, doing that, never one time went anywhere outside
```

1    of that.  So guess what, why am I going to be worried?
2    If you get more money, that's what I'll give you; if
3    you get less money, that's what I'll give you.  I've
4    always abided by the rules so I didn't care what it
5    was.
6         Q.  Was there -- do you know if there was any
7    conversation or incident that prompted Ms. Pritchard
8    to bring an action to try to increase the amount of
9    child support?
10        A.  There was.  It was great.  I believe -- oh,
11   yeah, my lawyer told me this.
12            MR. SPENGLER:  Yeah.
13            THE WITNESS:  What?
14            MR. SPENGLER:  Well, conversations between
15   you and your lawyer are privileged.
16            THE WITNESS:  Oh.
17            MR. SPENGLER:  If you want to disclose them,
18   you can.
19        Q.  It's your right.  I can't -- I have a
20   duty --
21        A.  Oh, okay.  Sorry about that.  See, I
22   don't -- all these ins and outs of all this stuff --
23        Q.  You can waive the privilege and tell me, but
24   I don't want you to think you have to.
25        A.  Basically what happened, she dropped

1  paperwork on me when she saw me on TV with Jesse

2  Itzler.

3     Q.  Okay.

4     A.  She saw -- she saw that and then dropped

5  paperwork on me assuming that I made more money.

6     Q.  Had you, in the preceding years, informed

7  Ms. Pritchard of the amount of money that you were

8  making in connection with your speaking engagements?

9     A.  No.  We weren't talking.

10    Q.  Did you, at any point, inform her about your

11  agreement with Jesse Itzler to receive half the

12  royalties?

13    A.  I don't know why I would discuss that with

14  her.  That's my personal life, what I'm doing.

15    Q.  You didn't think that what you were making

16  in terms of income was something that she needed to

17  know for purposes of child support?

18    A.  I thought that -- well, I didn't think.  I

19  know if I'm doing what I'm ordered to do -- only time

20  there's concern with something is if you're not doing

21  what the law tells you to do.  So I've always done

22  what the law told me to do so no, there was no

23  concern.

24    Q.  Did you ever tell anybody in the Navy that

25  Jade was the child of an Air Force grunt?

```
 1          Q.  Has anybody discussed with you or mentioned
 2     to you any of the allegations in the lawsuit?
 3          A.  I don't believe so.
 4          Q.  Okay.  All right.
 5          MR. MEEK:  I believe those are all the
 6     questions.  I have appreciate your time today.
 7          THE WITNESS:  No.  You guys are awesome.
 8          You are amazing.
 9          MR. SPENGLER:  I just have a small handful
10     of questions just to get something on the record here.
11                        EXAMINATION
12     BY MR. SPENGLER:
13          Q.  Mr. Goggins, when did you start living with
14     your mother?
15          A.  When I retired, November of 2015.
16          Q.  November of 2015?
17          A.  Uh-huh, around there.
18          Q.  And where did you say you lived earlier in
19     2015?
20          A.  I lived in Illinois, Libertyville.
21          Q.  Okay.  Did you and Mr. Castro ever discuss
22     compensation for what was to become a film?
23          A.  No, never.
24          Q.  What was your understanding of the
25     compensation that each of you would earn if the film
```

1  was to be produced?

2      A.  I don't have any answer for that, like there

3  was no talk about compensation at all.

4      Q.  Did Mr. Castro ever ask you what you would

5  accept in compensation if the film was to be produced?

6      A.  No.  Like I said, there was no talk about

7  compensation.

8      Q.  Did he ever offer you any percent of the

9  revenue profit, any other form of compensation?

10      A.  No.

11      Q.  What would you have received in compensation

12  had the film been produced?

13          MR. MEEK:  Objection.  Form.

14      A.  I have no idea because none of this was

15  talked about.

16      Q.  And earlier I believe you testified that you

17  have no knowledge of industry norm or standards in

18  terms of compensation for films and various roles in

19  the production of films.  Is that correct?

20      A.  That's correct.  As a matter of fact, what

21  you just said makes no sense to me.  I have no idea

22  what you're talking about.

23      Q.  Let me restate the question.  You have no

24  industry knowledge about how much anybody gets paid in

25  the production of a film?

```
 1        A.   No.

 2             MR. MEEK:  Objection to form.

 3        A.   I have no idea what anybody gets paid.

 4        Q.   Would you have agreed to accept no money in

 5   compensation to produce the screenplay that Mr. Castro

 6   last presented to you in 2015?

 7             MR. MEEK:  Objection.  Form.

 8        A.   Never in a million years would I ever just

 9   give somebody what I went through in my life for free.

10        Q.   And did you ever communicate anything to the

11   contrary to Mr. Castro?

12        A.   No, never have.

13             MR. SPENGLER:  No further questions.  Do you

14   want to redirect?

15             MR. MEEK:  We're done.

16             MR. SPENGLER:  Okay.

17             (The deposition concluded at 2:40 p.m.)

18             (Signature was reserved.)

19

20

21

22

23

24

25
```