**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**
**Civil Action No. 1:16-cv-10**

| | |
|---|---|
| PAUL J. CASTRO, | |
| Plaintiff, | |
| v. | **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| DAVID GOGGINS, | |
| Defendant. | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7.2 and 7.3, Defendant David Goggins ("Goggins") respectfully submits this Brief in Support of Defendant's Motion for Summary Judgment.

## NATURE OF THE MATTER BEFORE THE COURT

This action arises out of a relationship between one-time friends who, over many years, had various communications about making a movie together about the life of Goggins. Plaintiff Paul Castro ("Castro") filed a confusing complaint advancing breach of an alleged contract as its sole claim for relief. Plaintiff never amended the Complaint to add any clarity, likely because the facts establish that, in reality, there was no contract. Plaintiff's claim fails. There was never a valid and enforceable contract between the parties addressing all material terms of an agreement, not least of which was compensation. Any consideration by Castro was illusory at best. Moreover, even accepting Plaintiff's allegation of a contract as true, Plaintiff has been unable to articulate any damages from

1

the alleged breach. Accordingly, Goggins' Motion for Summary Judgment should be granted and Plaintiff's breach of contract claim should be dismissed with prejudice.

## STATEMENT OF THE FACTS AND CASE

At some time before 2008, Goggins and Castro met in San Diego, California while serving together in the United States Navy. (Castro Dep. 16:23, 18:4-22; Goggins Dep. 9:13-10:1) Castro was a public affairs officer, and Goggins was a recruiter. (Goggins Dep. 9:13-10:1) Castro had graduated in 2000 with a Masters in film and television from the University of California at Los Angeles. (Castro Dep. 7:6) His career as a professional screenwriter includes, most notably, being a writer on *August Rush*. (Castro Dep. 8:17-25, 9:6-9, 11:2-8) Goggins is a former Navy SEAL, ultramarathon runner, ultra-distance cyclist, and triathlete. (Compl. ¶ 9; Goggins Dep. 8:18, 42:15-16) He once held the world record for most pull-ups completed in a 24-hour period. (Castro Dep. 33:16-34:8)

Around 2008, Castro and Goggins first discussed making a film based on the true story of Goggins' life. (Castro Dep. 18:15-16; Goggins Dep. 12:11-14, 13:3-15). On October 15, 2008, the parties signed a handwritten note (hereinafter, the "2008 Handwritten Note"), which reads in its entirety, "This confirms that Paul Castro and David Goggins will partner on the feature film project about David Goggins' life story. Paul Castro will be the sole screenwriter." (Goggins Dep. Ex. 1) No movie was made following the signing of this note. (Castro Dep. 27:3, 28:22-29:4, 30:23-24) The men parted ways and did not speak for a protracted period of time. (Castro Dep. 30:8-24)

2

Then, around 2014, Castro reached out to Goggins by text message to let him know Castro's film students at Elon University "love[d]" the abandoned script that he had pitched to them. (Castro Dep. 36:12-17) Castro suggested the two men arrange a phone call to discuss resuming work on the project. (Castro Dep. 36:23-25) As recounted by Castro, "David said that the only way he would proceed with a movie about his life is if I got it right as far as, you know, the story that he wanted to tell." (Castro Dep. 37:4-7) Castro re-worked the existing script and made other arrangements to move the project forward. (Castro Dep. 53:5-8)

Castro's efforts culminated with a meeting he arranged for February 25, 2015 with the Gersh Agency, an entertainment company. Prior to the meeting, the Gersh Agency requested that Castro secure some form of written document from Goggins. (Castro Dep. 47:20-21) In response to Gersh's request, on February 15, 2015, Castro drafted and sent Goggins an email asking Goggins to send a reply message containing the following:

> Let this serve as a legal document confirming that writer-director Paul Castro is the only person that I grant the right to write, direct, produce, and set up the feature film version of my life story and the book version of my life as well. This includes the portrayal of Jackie Goggins, my mother, and her life represented in my story. Any changes to the screenplay or the book must be first granted permission by me, David Goggins and Paul Castro in writing. A more detailed version of this document is to come, but let this serve to protect the partnership between me and David Goggins and Paul Castro in bringing my life story to the work via feature film and/or book. Also, Paul Castro is the only person directing my movie! Thank you. Respectfully, David Goggins. February 15, 2015. (Castro Dep. 47:20-21; Goggins Dep. Ex. 16)

Castro explained his purpose for sending this email

3

> [B]efore going into a high level meeting with some very
> valuable contacts that were going to be producing this movie,
> they were asking do you have a written agreement with David
> Goggins. . . . I told David that it would be appreciated and wise
> to protect both of us to have an agreement between us moving
> forward. And he didn't want to hire an entertainment attorney
> and he said I don't even know what to say. And I said would
> you like me to send you a rough draft and then you could tweak
> and tune it whichever way you want. . . . So I wrote what I
> thought would be sufficient for the people we were meeting
> with and he sent it back with some edits…
> (Castro Dep. 47:18-48:10)

Thus, the email was not a contract between these men—it was a document to show

to "very valuable contacts" to demonstrate that Goggins and Castro had some relationship.

Consistent, Goggins's testified that the purpose of the 2015 Email was to help secure a

meeting with the Gersh Agency:

> [I]t was a letter. [Castro] said that to have this meeting, David
> – he was real frantic about it. He kept talking and talking,
> talking, talking about this letter, that he needed this letter,
> needed before this meeting to show people that we were trying
> to work together on something. So I know at this time he was
> trying - so he actually drafted some letter up and sent is it *[sic]*
> over and my mom kind of did the rest. (Goggins Dep. 122:13-
> 21)

Goggins explained why his mother responded to the email

> It came about I was upstairs working. Like I say, I was going
> to go be wildlands firefighter in a few months so I was kind of
> getting packed up, getting ready to go. And I was also getting
> ready to go to California. And my mom got this email and the
> emails says exactly what it says. She says, hey, I got this email
> from Paul. It was sent to my email, my mom checked it out and
> I was upstairs doing work. And Paul had sent so many emails
> this day wanting this email back, that I was too busy and I was
> like, hey, look at it, if it doesn't sound stupid, because I'm not
> getting into a legal agreement with Paul right now, I'm going

4

to wait until after this – until after this doggone thing…And she wrote this….What I said was look at the e-mail, read it over and then you use your best judgment on the email. (Goggins Dep. 133:5-22, 134:19-21)

When asked to explain why his mother edited the language in Castro's email, Goggins testified, "I have no idea why she edited it. Maybe because she didn't like how it read. I don't know." (Goggins Dep. 139:14-15). The email response that Goggins, through his mother, sent back to Castro on February 18, 2015 (the "2015 Email") reads as follows:

Let this serve as a legal document confirming that writer-director Paul Castro is the only person that I grant the right to write and direct the feature film version of my life story and the book version as well. This includes the portrayal of Jackie Goggins Garner, my mother and her life represented in my story. In my absence, I grant Jackie Goggins Gardner the authority to make any necessary decisions. Any changes to the screenplay or the book must be first granted permission by me, David Goggins in writing.

A more detailed version of this document is to come.

This letter serves as confirmation that Paul Castro is the only person I grant permission to bring my life story to the world via feature film and/or book. Also, Paul Castro is the only person directing my movie! (Goggins Dep. Ex. 17)

One week later, on February 25, 2015, Castro and Goggins met at the offices of the Gersh Agency with several people in the movie industry. (Castro Dep. 56:1-6; Goggins Dep. 121:7-122:6) According to Castro, after the meeting Goggins "did a disappearing act and when we finally spoke, 24 hours later, he finally took my sixteenth call, he said I don't want to do the movie." (Castro Dep. 56:10-13) Goggins testified that he felt betrayed that Castro did not disclose to Gersh Agency those portions of the script that were fictionalized.

5

(Goggins Dep. 114:16-115:16) Goggins objected, in particular, to a fictionalized scene in which he was portrayed rescuing another ultramarathon runner who had collapsed in the desert heat. (Goggins Dep. 148:5-148:12) While the parties do not agree why Goggins decided to not move forward with the film, they agree that he communicated that decision to Castro within a day of the Gersh Agency meeting and a week from the email of February 18, 2015.[1]

On November 3, 2015, Jesse Itzler published *Living with a SEAL*, a book about living with Goggins for 31 days. (Compl. ¶ 23). There is no allegation that the book purports to tell Goggins' "life story." (*Id.*) On December 19, 2015, Goggins sent an email to Castro confirming that they had no relationship, in regards to a book or film about Goggins' life story. (Goggins Dep. Ex 19)

On January 8, 2016, Castro filed a Complaint alleging one claim of breach of contract (Compl. ¶¶ 28-32 [Doc. 1]) On March 16, 2016, Goggins moved to dismiss the Complaint for failure to state a claim. (Def.'s Mot Dismiss [Docs. 6-7]) On April 11, 2016, Plaintiffs filed a brief in opposition to the Motion to Dismiss (hereinafter, "Plaintiff's Brief") (Pl's Br. Opp'n Mot. Dismiss [Doc. 8]), and this Court issued a Memorandum Opinion and Order on August 26, 2016. ("the Order") (Order Den. Def.'s Mot. Dismiss [Doc. 11])

---

[1] Not surprisingly, Castro testified that onBuzz (the company allegedly slated to provide financing for the movie) never agreed to be contractually obligated to fund the movie. (Castro Dep. 51:13-20) Following the decision to not move forward, no entity made a demand for payment from Castro for failing to produce the script. (Castro Dep. 56:24-57:18)

In the Order, the Court observed, "[I]t appears to this court that Plaintiff seeks to allege two different contracts in the Complaint." (Order at 3) The Court observed further that "[b]ecause, specifically under the claim for relief, the contract being sued upon is one in which Defendant granted Plaintiff exclusive rights to write and produce a film about the Defendant's life, this court construes the Complaint as alleging a breach of contract granting exclusive rights to Defendant's life story, as described in the February 18, 2015 writing, (see id. ¶ 19), and not 'the Agreement' entered into in 2008. (see id. ¶ 9.)" (Order at 6) The Court thus found that the 2015 Email "represents an allegation containing the required elements of a valid contract" and sufficient to survive the motion to dismiss. (Order at 13). The Complaint does not allege an oral contract. (*See* Compl. [Doc. 1]) Castro never attempted to amend the Complaint.

In reaching its finding of a plausible contract, the Court apparently relied on statements in Plaintiff's Brief— "Goggins wanted a book and movie made about his life, presumably in part for the intangible benefits he might have derived from such a venture and perhaps in part for the monetary benefits he could derive from other sources."—to find "a reasonable inference from Plaintiff's allegations that the price to be paid was simply the exchange of services" and thus that the alleged 2015 agreement included all essential contractual terms. (Order at 20-21). That was Castro's theory in briefing before this Court, but that was not his testimony or the evidence.

In reality, Castro testified to yet a new theory—that the men had some nebulous agreement for compensation; though, as will be explained, Castro admits that the

7

compensation figures were never agreed to by the men. Castro testified to a discussion between the parties "early on" where the parties agreed Castro's compensation would be "$600,000 plus" and Goggins' compensation would be more than Castro's and "at least a million." (Castro Dep. 67:7-19) During this conversation—conducted telephonically while Castro sat on the couch of his living room—Goggins purportedly agreed to binding terms as to part of the compensation Castro might receive:

> David obviously is very good with money so that was the first order of business . . . . So I believe David Goggins mentioned that he read Marcus Luttrell got 2.5 million dollars for his life rights for Lone Survivor, and I researched it and I know it was over 2 million dollars, but I also mentioned to David Goggins that Lone Survivor was a best-seller. . . . I wasn't confident that [Goggins] would be able to achieve that number with this type of story. And he asked me what did I think and I said, well, usually life rights are three to five percent of the budget. So back in 2009 . . . we did have a budget made and it was a 42 million dollar movie, but this time around and with all my rewriting of his story to get it right – the good news of the whole process was the budget went down, so we trimmed it a lot. So – but three to five percent of the budget – and he mentioned a million dollars, that that was his – anything less than a million dollars he's not interested in. So when talking with producer/financier/entrepreneur Alan Elias, the CEO of onBuzz, he was having a tough time with a million dollar life rights story when it wasn't Malcom X or Nelson Mandela or John F. Kennedy or Nixon – It was David Goggins. So I proposed what if we put in the budget $700,000 for David's life rights and then make him a producer on the movie, which is customary when you're doing someone's life rights often times, for 300,000 and that would put him at a million dollars, and the producer thought that was reasonable. And then I also explained to David that residuals are often more lucrative than the actual price you get initially with a screenplay – And as a producer he would certainly enjoy the residuals. He was pleased with that. (Castro Dep 37:1-39:13)

When asked if there was any documentation showing that Goggins had agreed to $700,000 for his life rights and $300,000 to serve as a producer, Castro responded, "The conversation he and I had." (Castro Dep. 41:11-12) Asked the same question again, Castro said, "Well, we had the documentation, the 2009 budget, which clearly stated that he would get over a million dollars – And he's definitely seen that." (Castro Dep. 41:17-22) In other words, the specifics of this compensation scheme "was mentioned in one of the budget sheets." (Castro Dep. 40:9-10) However, by Castro's own admission, Goggins was not a party to the budget sheet. (Castro Dep. 40:11-13) Castro further admitted that this 2009 budget document was no longer operative at the time of the 2015 Email, with the amount allocated for the proposed movie in 2015 "a lot less" than the original $42 million budget. (Castro Dep. 42:4-5) According to Castro, Goggins was still to make "seven figures," without further specification. (Castro Dep. 42:5-6)

Most significantly, Castro testified that a crucial piece of compensation for Goggins, as in any life story movie, would be Goggins' residuals. Residuals describes compensation paid in perpetuity after a movie's release for viewings on Netflix, television, or DVD rentals. (Castro Dep. 15:13-22) In fact, Castro says he "explained to David that residuals are often more lucrative than the actual price you get initially with a screenplay." (Castro Dep. 39: 8-10)

On this crucial term of compensation, the parties agree that they never agreed. Castro supposes that Goggins would receive the kind that were standard in the producer's guild, but he admits Goggins was not then a member of the producer's guild; that Castro

never told Goggins what where the standard residuals for producers; that Castro did not even know what the standard residuals were from the producer's guild (which of course would have made it impossible for him to communicate the amount to Goggins); and that Goggins was not required to accept the standard producer-guild rate for residuals. (Castro Dep. 42:10-44:23). When asked "So you [and Goggins] never agreed to a residual rate?" Castro responded unequivocally, "We did not." (Castro Dep. 46:5-7)

In the deposition of Goggins, Plaintiff's counsel curiously showed no interest in exploring Goggin's compensation related to the 2015 Email and did not ask Goggins any questions on this topic. The term "residual" is never mentioned in Goggins deposition in a question or an answer. On redirect, Mr. Goggins provided the following testimony on compensation:

> 25   Q.  What was your understanding of the
> 1   compensation that each of you would earn if the film
> 1   was to be produced?
> 2   A.  I don't have any answer for that, like there
> 3   was no talk about compensation at all.
> 4   Q.  Did Mr. Castro ever ask you what you would
> 5   accept in compensation if the film was to be produced?
> 6   A.  No.  Like I said, there was no talk about
> 7   compensation.
> 8   Q.  Did he ever offer you any percent of the
> 9   revenue profit, any other form of compensation?
> 10   A.  No.
> 11   Q.  What would you have received in compensation
> 12   had the film been produced?
> 13   MR. MEEK:  Objection.  Form.
> 14   A.  I have no idea because none of this was
> 15   talked about.
>                         . . .
> 4   Q.  Would you have agreed to accept no money in
> 5   compensation to produce the screenplay that Mr. Castro

10

```
 6   last presented to you in 2015?
 7          MR. MEEK:  Objection.  Form.
 8      A.  Never in a million years would I ever just
 9   give somebody what I went through in my life for free.
10      Q.  And did you ever communicate anything to the
11   contrary to Mr. Castro?
12      A.  No, never have.
13          MR. SPENGLER:  No further questions.  Do you
14   want to redirect?
15          MR. MEEK:  We're done.
```
(Goggins Dep. 220:24-222:15)

To date, Castro has not amended his complaint regarding the compensation terms
to align with the statement in Plaintiff's Brief that "Goggins wanted a book and movie
made about his life, presumably in part for the intangible benefits he might have derived
from such a venture and perhaps in part for the monetary benefits he could derive from
other sources" and that price to be paid was simply the exchange of services. Nor has Castro
amended the Complaint to allege a contract with the various monetary terms and
obligations Goggins would encounter as described, for the very first time, in Castro's
deposition.

Not only did the parties not agree on residuals, the parties did not agree to what
Goggins would be required to do as part of the movie's production and release. Castro
asserts that—if the script went forward into production—Goggins would have been forced
to perform many other tasks that were not agreed to. According to Castro, Goggins would
have been obligated to (1) serve as a consultant on the movie (Castro Dep. 55:6-12); (2)
work as a producer on the movie, "which means the movie star would be asking him key
questions about how he would play the part and would he do this and is this appropriate to

the character that he's playing" (Castro Dep. 55:13-17); (3) serve as "subject matter expert as far as, you know, there's military activity that's specific to his discipline" (Castro Dep. 57:24-58:2); (4) make press appearances to promote the film (Castro Dep. 58:24-59:8); and (5) "communicate the truth about his life." (Castro Dep. 77:14-15) In addition, Castro testified, "I would imagine there's other roles but I have not listed them." (Castro Dep. 59:14-15)

Yet, Castro's testimony reveals that the framework of these obligations was never in agreement. For example, Castro testified that Goggins would have received compensation for serving as a consultant, or at least that the budget included a line item for this work. (Castro Dep. 61:5-7) But when asked if Goggins agreed to this compensation figure for this consultant work, Castro replied, "I don't even think we discussed it." (Castro Dep. 61:8-9) When asked if Goggins agreed to be paid nothing as a consultant, producer, or in residuals, Castro replied, "I have no way of knowing what David would want." (Castro Dep. 61:13-21) There was no agreement, nor even any discussion between the parties, on the amount of time Goggins was required to devote to his roles as consultant, producer, subject matter expert, and/or promoter. (Castro Dep. 71:23-72:23)

As unclear, confusing, and elusive as Castro's version of what the alleged contract is and has been in this case, he has flat never articulated his damages, despite obligations to do so. Item (iii) of Plaintiff's Rule 26 disclosures state "The Plaintiff has not yet determined his damages calculation. At present, however, the Plaintiff anticipates that this damages calculation includes: a. Damages, in an amount to be determined, arising out of

12

Defendant's breach of the agreement between the parties; b. Prejudgment and post-judgment interest; and c. Attorney's fees and costs." (Pl.'s Disclosures) To date, this disclosure has not been supplemented.

In response to Interrogatory 5, asking Castro to describe any funds he personally expended relating to the contract, he replied, "The Plaintiff has not yet calculated the amount that he has personally expended relating to the contract between the Parties. Any such calculation, to be supplemented, would include, at a minimum, funds spent on travel related to the agreement, on shipping, on the hiring of experts to budget and schedule a movie, and on copying and binding of the screenplay." (Pl.'s Answers Interrogs.) In response to Interrogatory 8, asking him to describe with particularity the damages he is seeking, Castro replied, "The Plaintiff has not yet calculated the damages he is seeking in this case and therefore will timely supplement this response." (*Id.*) To date, these interrogatory responses have not been supplemented.

Pursuant to Rule 26(a)(2), Castro produced an expert report describing some element of lost revenue that Castro alleges to have suffered. (Pl.'s Report [Doc. 30]) Unlike the $42 million budget Castro referenced regarding Goggins' compensation, the expert report referenced a $12 million budget. (*Id.* at 4) The report opines that Castro lost $658,819 in salary from the unproduced movie based upon industry standards, but provides no other details of Castro's alleged damages. (*Id.* at 6-7; Castro Dep. 64:14).

## QUESTIONS PRESENTED

1. **CAN CASTRO ESTABLISH THAT HE AND GOGGINS HAD A CONTRACT WHEN THE PARTIES NEVER AGREED TO A PRICE TERM OR OTHER MAJOR OBLIGATIONS GOGGINS WOULD HAVE FACED, AND WHEN CASTRO'S TESTIMONY CONTRADICTS HIS PRIOR BRIEFING TO THIS COURT?**

2. **CAN CASTRO ESTABLISH A CONTRACT WHEN THE 2015 EMAIL, AND ANY OTHER ORAL CONVERSATIONS HE ALLEGES HE HAD WITH GOGGINS, NEVER BIND CASTRO TO DO ANYTHING?**

3. **CAN CASTRO ESTABLISH DAMAGES, AN ELEMENT OF A CONTRACT CLAIM, WHEN HE FAILED TO SET FORTH HIS DAMAGES IN HIS RULE 26 DISCLOSURES AND IN RESPONSE TO INTERROGATORIES?**

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). "When ruling on a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences. The moving party bears the initial burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Once the moving party has met this burden, the adverse, or nonmoving party, must set forth specific facts showing that there is a genuine issue for trial. In so doing, the adverse party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute." *Cincinnati Ins. Co. v. Centech Bldg. Corp.*, 286 F.Supp.2d 669, 679 (M.D.N.C., 2003) (internal citations omitted).

14

## ARGUMENT

I.   **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE PLAINTIFF HAS NO EVIDENCE OF A CONTRACT WITH MATERIAL TERMS.**

Plaintiff has ample evidence that two eccentric, well-intentioned men, for many years, swapped emails and text message, occasionally spending time in person, dreaming of making it big in Hollywood.  That does not make a contract.  Castro's confusing complaint and continually evolving theories have caused this litigation and expense, which should end now.

### A.   **Plaintiff Has No Evidence that He Ever Had a Contract with Goggins Whereby Goggins Would Give away Life Rights for No Monetary Compensation, as Promised in Plaintiff's Briefing Against Defendant's Motion to Dismiss.**

The doctrine of judicial estoppel prevents a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court. *See, e.g.*, *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007). "Judicial estoppel is a matter of federal law, not state law." *Lowery v. Stovall*, 92 F.3d 219, 223 n.3 (4th Cir. 1996).

The U.S. Supreme Court suggests three factors to determine when judicial estoppel should apply: (1) the party's later position must be clearly inconsistent with the earlier position; (2) the party must have succeeded in persuading a court to adopt the earlier position in the earlier proceeding; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (finding that if a litigant "assumes a certain position in a legal proceeding, and succeeds in

maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position").

The Fourth Circuit has articulated this third factor, alternatively, as whether the party "intentionally misled the court to gain unfair advantage," and declared this bad faith requirement to be the "determinative factor." *Zinkand*, 478 F.3d at 638. "It is inappropriate, therefore, to apply the doctrine when a party's prior position was based on inadvertence or mistake." *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 99 (4th Cir. 1995).

Judicial estoppel protects the "essential integrity of the judicial process" and prevents parties from "playing fast and loose" with the courts. *Allen v. Zurich Ins. Co.*, 667 F.2d 1166 (4th Cir. 1982).

> In another decision of the Fourth Circuit, the court noted that "the judicial process is not some kind of game." *Pa. Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 117 (4th Cir. 2012). If a litigant "assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (citation omitted). Judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8 (2000). *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 117 (4th Cir. 2012).

*Yates v. Med. Specialties, Inc.*, No. 3:11-cv-6, 2012 U.S. Dist. LEXIS 178736, at *10-11 (W.D.N.C. Dec. 17, 2012) (internal parenthetical omitted).

Applying the doctrine, Castro has asserted two "clearly inconsistent" positions on the compensation terms of the alleged contract. The 2015 Email (and the 2008 Handwritten Note, for that matter) do not include any reference to compensation terms. Castro represented in Plaintiff's Brief that these writings were *not* missing any material terms—because Goggins had agreed to accept no momentary compensation for the rights to his life story:

> The Defendant's observation that the agreement is silent as to how "compensation would be determined" is *curious* since it *assumes, without basis*, that there had to have been some agreement on this issue [i.e., for the exchange of money]. There need not have been. Goggins wanted a book and movie made about his life, presumably in part for the intangible benefits he might have derived from such a venture and perhaps in part for the monetary benefits he could derive from other sources. As with many of the other terms that the Defendant suggests might be "material" or "essential," there is *absolutely no reason to believe* that the parties at any time considered this to be material, essential, or open to further negotiation. As a consequence, this offers no basis for the Court to include *[sic]* as a matter of law that there was no meeting of the minds. (Pl's Br. Opp'n Mot. Dismiss 7 [Doc. 8] (emphasis added))

Then, both at the final hour of discovery and for the very first time, Castro provided sworn testimony that Goggins agreed to relinquish the proprietary rights to his life story, but only in exchange for "seven figures," that is an unspecified flat fee of at least $1 million and some unknown and undiscussed amount in residuals. The positions taken by Plaintiff on compensation terms are not legal theories pled in the alternative; they are directly contradictory assertions of fact that cannot be squared.

17

Second, Castro persuaded the court to adopt his earlier position in denying Defendant's Motion to Dismiss. Though it may have strained credulity for Goggins to accept no compensation in conjunction with a feature-length Hollywood film, this Court applied the appropriately deferential standard and accepted as true Plaintiff's allegations in the "confusing" complaint, as construed by the Court. (*See* Order Den. Def.'s Mot. Dismiss 2 [Doc. 11] ("[T]his Complaint is, at best, confusing.")) The Court expressly relied on Castro's representations in Plaintiff's Brief to find "a reasonable inference from Plaintiff's allegations that the price to be paid was simply the exchange of services." (*Id.* at 20-21)

Lastly, the third factor requires the Court to decide whether Plaintiff "intentionally misled the court to gain unfair advantage." The facts lead to no other conclusion. In one brief Plaintiff says that he wishes to prosecute a contract claim in which the defendant would receive no monetary compensation. (Pl's Br. Opp'n Mot. Dismiss 7 [Doc. 8]) In the same case, he later says the defendant would have received at least seven figures of compensation. (Castro Dep 37:1-42:6) On such a basic point of this litigation, the extreme pivot shows either intentional obfuscation or serious miscommunication between Plaintiff and his counsel.[2]

There is no dispute of material fact: the parties never had a meeting of the minds on those material contract terms asserted in Plaintiff's Brief. Nothing in evidence—certainly not Castro's contradictory deposition testimony—supports the assertion that Goggins

---

[2] The shifting goalposts of the alleged contract make it nearly impossible for Goggins to prepare an effective defense, and he has incurred more than $70,000 in legal fees to date. (Goggins Dep. 18:12-15)

agreed to grant Castro the exclusive rights to his life story in exchange only for services, and no monetary compensation. Goggins should be estopped from now asserting otherwise.

**B. Even Plaintiff's Eleventh Hour Theory that Goggins Agreed to Give Away Life Rights for Money also Lacks Material Terms, Including a Meeting of the Minds on Compensation and Other Material Terms**

1. <u>Plaintiff Admits that the Parties Never Agreed on Compensation Because They Never Agreed on Residuals, a Crucial Component of Compensation.</u>

In North Carolina, "to have 'a valid and enforceable contract between parties, there must be a meeting of the minds of the contracting parties upon all essential terms and conditions of the contract.' . . . Essential terms of a contract include . . . the price to be paid under it." *Apple Tree Ridge Neighborhood Ass'n v. Grandfather Mountain Heights Prop. Owners Corp.*, 697 S.E.2d 468, 472 (N.C. Ct. App. 2010) (internal citations omitted); *see also* Order at 14, 19 (quoting the same).

Application of this "well-settled principle of contract law," *id.*, requires the dismissal of breach of contract claims premised on missing or vague compensation terms. *See, e.g.*, *Beydoun v. v Clark Constr. Int'l, LLC*, 72 Fed. Appx. 907, at *912-13 (4th Cir., July 25, 2003) (Michigan law) (finding no contract for lack of material terms when, under a severance clause, the plaintiff was to receive "a lump-sum payment of 'a minimum' of $5 million and 'a maximum' of $20 million," with no further method of calculation); *Premier Signatures Int'l v. Feld Entertainment Prods., Inc.*, 1999 U.S. App. LEXIS 14028, at *6-7 (4th Cir., June 25, 1999) (Virginia law) (finding no enforceable contract for insufficiently certain material terms when compensation to broker was 12% for first year

19

of sponsorship and left vague—they would be "take[n] care of" or "get something" in commissions—in the event of a subsequent renewal of the sponsorship deal).

Even if this Court allows Castro to introduce conflicting deposition testimony concerning an alleged oral agreement,[3] Plaintiff's claim for breach of contract still must fail as a matter of law. As a preliminary matter, Plaintiff must answer the question of which version of the alleged "contract" he now seeks to enforce: the contract in which Goggins was to be paid nothing for the granting of his life rights, (Pl's Br. Opp'n Mot. Dismiss 7 [Doc. 8]) or the contract in which Goggins was entitled to receive "seven figures" for the same. (Castro Dep 37:1-42:6)

Even if the Court focuses its attention only on Castro's deposition testimony, Plaintiff's claim still must fail for a lack of a meeting of the minds on material compensation terms, as there unequivocally was no meeting of the minds on residuals. Castro admitted as much in deposition testimony. While he *supposed* that Goggins would receive the kind of residuals that were standard in the producer's guild, Castro conceded that Goggins was neither required to accept—nor even made aware of—that rate. (Castro Dep. 42:10-44:23) Castro himself could not testify to the supposed rate Goggins was to receive, and he unequivocally admitted there was no agreement with Defendant on the rate of residuals. (Castro Dep. 43:15-17, 46:5-7) This is a significant omission. According to Castro's own testimony, the amounts of residuals are "often more lucrative" than any flat fee paid. (Castro Dep. 39:8-10)

---

[3] It bears repeating that Plaintiff does not plead an oral contract. (*See* Compl. ¶¶ 28-32 [Doc. 1])

This is to say nothing of the flat fee to which Goggins was purportedly entitled, for which Castro's testimony is filled with ambiguity and indefiniteness. The flat fee that Goggins purportedly accepted was based on one conversation "early on" and no document, other than an outdated and inapplicable budget to which Goggins was not a party and which Castro could not testify that Goggins had even seen. (Castro Dep. 40:3-42:9, 67:7-19) It is unclear from Castro's testimony whether Goggins was contractually entitled to a flat fee of exactly one million dollars (i.e., $700,000 for his life rights and $300,000 to serve as producer), or some unspecified amount "over a million" dollars or "seven figures." (Castro Dep 37:1-39:13, 41:17-22, 42:5-6)

Simply stated, the parties never agreed to compensation, a material term of any valid contract in North Carolina.

> 2. Plaintiff Admits that the Parties Never Agreed on What Goggins Was to Do as Part of Production, Despite Potentially Onerous and Material Obligations.

Under North Carolina law, "Personal service contracts are subject to restrictive rules of interpretation, requiring for their enforcement certainty as to the nature and extent of the services to be performed, the place where and the person to whom services are to be rendered, and the compensation to be paid." *Humphrey v. Hill*, 285 S.E.2d 293, 295 (N.C. Ct. App. 1981) (citing among others *Croom v. Goldsboro Lumber Co.*, 108 S.E.2d 735, 737 (N.C. 1921)).

Plaintiff's claim here suffers from the same deficiencies as detailed above: Castro's deposition testimony contradicts his earlier with respect to the personal services Goggins was required to perform. The same preliminary question must be answered by Plaintiff

21

with regard to which contract Castro is now seeking to enforce at this stage in the litigation: the contract in which Goggins's only obligation was to grant rights to his life story to Castro, (Pl's Br. Opp'n Mot. Dismiss 7 [Doc. 8] (emphasis added) or the contract in which Goggins was obligated to not only grant rights to Castro, but also serve as consultant, producer, subject matter expert, and promoter, among other things, (Castro Dep. 55:6-59:8).

As Plaintiff's Brief asserted,

> [T]here is no uncertainty or indefiniteness in the parties' agreement: Castro would write and produce Goggins' life story in exchange for a grant of exclusive rights to that story. There is no allegation in the Complaint that suggests that at any time during the course of the parties' relationship *any uncertainty or indefiniteness* existed as to what the agreement was between the parties. (Pl's Br. Opp'n Mot. Dismiss 7 [Doc. 8] (emphasis added))

In other words, according to Plaintiff's Brief, the parties' agreement contained certain and definite material terms: a granting of exclusivity by Goggins in exchange for writing by Castro, and nothing more. Just as there was no reason to believe that Goggins was entitled to receive any compensation under the agreement, there also was no reason to believe Goggins was obligated to perform any services—or so Plaintiff argued.

Contrary to Plaintiff's Brief, Castro testified that Goggins was contractually bound to perform a series of potentially onerous services as part of the production of the film. According to Castro, if the film had moved forward with production, Goggins would have been required to serve as a consultant, producer, and subject matter expert, prior to and during the filming of the movie. After production, he would have been obligated to make

22

press appearances to promote the film's release. (Castro Dep. 55:6-17; 57:24-58:2; 58:24-59:15; 77:14-15) These are not insignificant details. Castro offered in his own testimony, for example, that press appearances are "a huge part" of the production of a film. (Castro Dep. 58:24-59:8) Castro also asserted that even this list of obligations was not exhaustive.[4] (Castro Dep. 59:14-15

It is unclear on what basis Castro claims that Goggins promised to serve as consultant, producer, subject matter expert, and promoter of the film. The seven-sentence 2015 Email fails to include any reference to these terms. (*See* Goggins Dep. Ex. 17) In fact, because the men had not yet agreed to material terms, it says, "A more detailed version of this document is to come." (*Id.*) Castro's own deposition testimony reveals no agreement to material terms. For example, there was not any discussion between the parties on the amount of time Goggins was required to devote to his roles as consultant, producer, subject matter expert, and/or promoter. (Castro Dep. 71:23-72:23) And when asked if Goggins had agreed to perform these additional services for no additional compensation, Castro replied, "I have no way of knowing what David would want." (Castro Dep. 61:13-21)

The record fails to demonstrate any evidence of an agreement to definite and certain terms of a binding contract for Goggins to give the irrevocable rights to his "life story" to Castro. The undisputed evidence in the record leads to the inevitable conclusion that the

---

[4] In Castro's conception of his "contract" with Goggins, Defendant may even have been obligated *to Castro* to pay child support. (*See* Castro Dep. 79:25-82:1) Goggins denies any accusation of unpaid child support. (Goggins Dep. 200:20-209:23) This Court declined to dismiss Defendant's counterclaim for defamation, adopting the magistrate judge's finding that Plaintiff's child support allegations were so "palpably irrelevant" to the breach of contract claim that they fell outside the bounds of the litigation exception to defamation. (Mem. Opinion Order Rec. 11 [Doc. 21]; Order Den. Pl.'s Mot. Dismiss [Doc. 22])

23

2015 Email was nothing more than a document to open the door to a meeting with the Gersh Agency. (*See* Castro Dep. 47:18-48:10; Goggins Dep. 122:13-21) The Complaint does not allege an oral contract and, even if it had, there is no support in the record for finding one. Denying Defendant's motion for summary judgment would require this Court to attempt to construe, yet again, an alleged contract that even Plaintiffs cannot consistently describe and present to the court.

## II.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE CONTRACT HE FANTASIZES, EVEN IF IT HAD MATERIAL TERMS, IS ILLUSORY.

An enforceable contract requires more than illusory consideration. "One of the elements of a valid contract is a promise, which has been defined as an assurance that a thing will or will not be done. 'The mere expression of an intention or desire is not a promise, however.'" *Bowman v. Hill*, 262 S.E.2d 376 (N.C. Ct. App. 1980) (quoting 17 AM. JUR. 2D, CONTRACTS § 2) (finding no valid contract when the letter at issue did "not carry the thrust of a promise to do or refrain from doing anything," but rather merely an intent by the defendant to provide funding to the plaintiff). "An apparent promise which, according to its terms, makes performance optional with the promisor no matter what may happen, or no matter what course of conduct in other respects he may pursue, is in fact no promise. Such an expression is often called an illusory promise." *Id.* at 377. (quoting WILLISTON, CONTRACTS § 1A (3d ed. 1957))

"Consideration which may be withdrawn on a whim is illusory consideration which is insufficient to support a contract." *Kadis v. Britt*, 29 S.E. 2d 543 (N.C. 1944). "Words

24

of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise and instead, constitute an illusory promise." *BCD LLC v. BMW Mfg. Co., LLC*, 360 Fed. Appx. 428, 435 (4th Cir. 2010) (internal quotations omitted) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 77 cmt. a (1981)). In determining whether a promise is illusory, the court "may not, under the guise of construction, ignore or delete any of its provisions, nor insert words into it, but must construe the instrument as written." *Bowman*, 262 S.E.2d at 377 (internal citation omitted).

In *RLM Communications, Inc. v. Tuschen*, 66 F. Supp. 3d 681 (E.D.N.C. 2014), the court held unenforceable a non-compete provision of an employment agreement premised on an apparent promise, as opposed to an actual promise. The court interpreted the language of the agreement and found the plaintiff-employer did not *promise* to do anything; the purported "consideration" was the *optional* provision by the company of confidential information to the employee. *See id.* at 692 (quoting terms of the employment agreement: "the Employer *may disclose*" confidential information and the "confidential information *may be obtained* in written materials" (italics in original)). The court reasoned,

> In this manner, the provision of company private information, whether as consideration for the covenant not to compete or the confidentiality agreement, is an "apparent promise" which makes performance optional with plaintiff. Such a contract, "while reciting consideration, actually does not bind the employer to any promise," and thus the "purported consideration was illusory at best."

*Id.* (quoting *Bowman*, 262 S.E.2d at 377 and *Milner Airco, Inc. v. Morris*, 433 S.E.2d 811, 814 (N.C. Ct. App. 1933)). It made no difference in the court's analysis that the defendant

25

*in fact* received confidential information; the analysis turned on whether the company had *obligated* itself to deliver the information. *See id.* at 693.

For the same reason the purported contract failed in *RLM Communications*, any alleged contract between the parties in this matter is illusory because it fails to bind or otherwise obligate Castro to do anything. The 2015 Email is the only writing that purports to reflect the terms of a contract between the parties, as interpreted by this Court. (*See* Order at 4-5) Indeed, in a revelatory moment, Castro referred to the 2015 Email as "the contract" in deposition testimony.[5] Again, Plaintiff does not explicitly allege an oral contract. (*See* Compl. ¶¶ 28-32)

The 2015 Email, as written, provides no indication whatsoever that Castro promised to do anything. Interpreting the facts in a light most favorable to Plaintiff, the document indicates only that Goggins promised to grant certain rights to Castro, that is "the right to write and direct the feature film version of [his] life story and the book version as well." Castro makes no reciprocal promise to Goggins that would constitute adequate consideration to form a binding contract. Plaintiff can point to no evidence in the record to reflect "the thrust of a promise" by Castro to do anything; rather, the evidence suggests a "mere expression of intention or desire" that made performance optional with Castro. Unlike in *RLM Communications, Inc.*, there is not even an apparent promise here—the 2015 Email is completely silent on Castro's obligations, and it promises a more detailed

---

[5] "*The contract* is dated February 18, 2015 . . . ." (Castro Dep. 80:22-23 (emphasis added))

document to come. (Goggins Dep. Ex. 17) For these reasons, any consideration by Castro

is illusory, at best, and there is no contract to enforce.

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE CASTRO HAS NEVER ARTICULATED DAMAGES, INCLUDING A FAILURE TO DO SO IN DISCOVERY AND THIS COURT'S MANDATORY DISCLOSURES.

The failure to disclose damage calculations can be fatal to a plaintiff's case, under

the Federal Rules of Civil Procedure. For example, in *Reid v. Charlotte-Mecklenburg Bd.*

*Of Ed.*, 3:14-cv-66 (W.D.N.C. July 28, 2016) (Whitney, C.J.), the court did not allow a

plaintiff to present damages evidence not disclosed under Rule 26. Plaintiff had provided

a list of the types of damages he sought, but never provided the calculation. Similarly,

in *Montilla v. Walmart Stores, Inc.*, 2:13-cv-2348 (D. Nev. Sept. 16, 2015), the court barred

evidence of future medical expenses because the plaintiff never disclosed them. *See also*

*Columbia Cas. Co. v. Neighborhood Risk Management Corp.*, 14 Civ. 48 (S.D.N.Y. Jan

14, 2016) (barring claimant from presenting evidence on one theory of damages because

of lack of disclosures under Rule 26(a)(1)(A)(iii))

The most complete statement Defendant can find in the Fourth Circuit on the

analysis applied to undisclosed damages comes from *Silicon Knights, Inc. v. Epic Games,*

*Inc.*, No. 5:07-cv-275, 2012 U.S. Dist. LEXIS 63707 (E.D.N.C. May 7, 2012):

> Federal Rule of Civil Procedure 26(a)(l)(A)(iii) requires a party to disclose to its opposing party "a computation of each category of damages claimed by the disclosing party—who must also make available . . . the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered . . . ." Fed. R. Civ. P. 26(a)(l)(A)(iii). A party cannot

27

fulfill this requirement by providing "undifferentiated financial statements; it requires a 'computation,' supported by documents." *Design Strategy. Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006); *see Bullard v. Roadway Express* 3 F. App'x 418, 420-21 (6th Cir. 2001) (per curiam) (unpublished); *Frontline Med. Assocs.. Inc. v. Coventry Health Care* 263 F.R.D. 567, 569 (C.D. Cal. 2009) ("Simply producing financial statements . . . is not sufficient."); *Shock v. Aerospace Integration Corp..* No. 3:08cv304/RV/EMT, 2009 WL 595923, at *4-5 (N.D. Fla. Mar. 6, 2009). Instead, a party's Rule 26(a)(l)(A)(iii) disclosure must state the types of damages that the party seeks, must contain a specific computation of each category, and must include documents to support the computations. *See, e.g.*, *Design Strategy. Inc..* 469 F.3d at 295.

Rule 26(e) requires a party to "supplement or correct its [Rule 26(a)] disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . . ." Fed. R. Civ. P. 26(e)(1)(A). Moreover, a party may supplement its Rule 26(a)(l)(A)(iii) "computation" by producing an expert report (including documents) that complies with Rule 26(a)(1)(A)(iii). Furthermore, when a party receives additional documents that it intends to use to prove its damages, or when its previous damages computation becomes otherwise inadequate, a party must supplement its Rule 26(a)(1)(A)(iii) computation. *See Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d l221, 1229 n.2 (10th Cir. 1999): *Hertz v. Luzenac Am.. Inc..* No. CIVA04CV1961LTBCBS, 2006 WL 994431, at *10 (D. Colo. Apr. 13, 2006) (unpublished).

When a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1) provides trial courts wide discretion to remedy violations of Rule 26(a) or Rule 26(e). In exercising its "broad discretion," a trial court determines whether a party's failure to comply with Rule 26(a) or Rule 26(e) was "substantially justified or is harmless" by considering (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure

28

> the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence. *S. States Rack & Fixture. Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

*Id.* at *2-4.

Defendant should prevail on summary judgment because plaintiff never disclosed any damages model. Likely, this omission is because, candidly, there are no damages.

Plaintiff provided its initial Rule 26 disclosures on October 17, 2016. Plaintiff's Rule 26(a)(1)(A)(iii) disclosure to provide its damages states, "The Plaintiff has not yet determined his damages calculation." It then goes on to categorize three categories of damages it "anticipates" the damages calculation to be. (Pl.'s Disclosures) Elsewhere, Plaintiff declined to substantively answer an interrogatory asking him to detail the funds he expended related to any contract with Goggins. (*See* Pl.'s Answer Interrogs. No. 5) Plaintiff's response is particularly vexing because the interrogatory does not ask for any profound expert testimony or legal analysis; it merely asks Plaintiff how much he personally has spent. Likewise, Plaintiff failed to provide a substantive answer to another interrogatory asking him to describe his damages with particularity. (*See* Pl.'s Answer Interrogs. No. 8)

In this case as in *Reid*, Plaintiff declined to provide his damages calculation throughout discovery. The closest Plaintiff came was an expert report on January 31, 2017 from a man who purports to explain Plaintiff's base salary had the script been produced into a movie. He assumes that the movie would have been shot subject to union standard

wages and purports to know the duration of shooting, 31 weeks of work. Plaintiff did not pretend that the expert report supplements the above-referenced Interrogatory Nos. 5 or 8 or his Rule 26(a)(1)(A)(iii) damages disclosures. Indeed, the expert did not identify what amounts Plaintiff spent related to the alleged contract, an essential part of his damages. Nor does the expert explain what the cost to Castro of 31 weeks of work would have been; how Castro mitigated any alleged damages; what other income he was able to obtain with 31 weeks suddenly free (allegedly); or what personal costs Plaintiff would have incurred during those 31 weeks. As such, although the expert report arguably provides some information that could be useful in making Castro's damages calculation, it is only a small, and incomplete, part.

If Plaintiff now was able to provide such a calculation, the surprise to Defendant would be strong, particularly because—as pointed out by the Court earlier—the entire basis of Plaintiff's case has been confusing at best. Both parties have given intention to file dispositive motions, meaning that the case would be disrupted if Plaintiff could now supplement.

Moreover, the evidence here is important—damages is an element of Plaintiff's claim. This is the key question in the whole case—what it is that Plaintiff claims he lost, as a result of this movie not going forward. Lack of evidence of damages is yet one more reason that Plaintiff's case fails.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant David Goggins respectfully requests that this Motion for Summary Judgment be granted, and that Plaintiff's complaint be dismissed with prejudice.

This the 15th day of May, 2017.

**/s/ Andrew L. Fitzgerald**
Andrew L. Fitzgerald (N.C. Bar 31522)
FITZGERALD LITIGATION
119 Brookstown Ave., Ste. 402
Winston-Salem, NC 27101
andy@fitzgeraldlitigation.com
(336) 793-4365 (phone)
(336) 793-4696 (fax)

Eric Spengler (N.C. Bar 47165)
SPENGLER & AGANS, PLLC
1713 East Blvd. Ste. B
Charlotte, NC 28203
eric@spengleraganslaw.com
(704) 910-5469 (phone)
(704) 730-7861 (fax)

## <u>LOCAL RULE 7.3 CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that this Brief in Support of Defendant's Motion for Summary Judgment complies with the word count requirements of Local Rule 7.3(d)(1). The word count of this brief is 8,822.

This the 15th day of May, 2017.

**/s/ Andrew L. Fitzgerald**
Andrew L. Fitzgerald (N.C. Bar 31522)
FITZGERALD LITIGATION
119 Brookstown Ave., Ste. 402
Winston-Salem, NC 27101
andy@fitzgeraldlitigation.com
(336) 793-4365 (phone)
(336) 793-4696 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

This the 15th day of May, 2017.                                     **/s/ Andrew L. Fitzgerald**