**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

PAUL J. CASTRO,

          Plaintiff,

v.

DAVID GOGGINS,

          Defendant.

**Case No. 1:16-cv-10**

**PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOW COMES the Plaintiff, by and through the undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, and respectfully moves the Court for partial summary judgment in his favor on the Defendant's Counterclaim (Count I: Defamation).

**STATEMENT OF THE NATURE
OF THE MATTER BEFORE THE COURT**

This is an action brought by the Plaintiff, a professional screenwriter, after the Defendant breached a contract he had with the Plaintiff, pursuant to which the Defendant agreed that the Plaintiff would have the exclusive right to write, produce, and direct a film and book about the Defendant's life in exchange for the Plaintiff using his knowledge, skill, and industry to bring the film and book into production.

In the Complaint, the Plaintiff alleges certain facts about the Defendant's true life story, which the Plaintiff believed were relevant and pertinent to an anticipated defense by the

Defendant that the Plaintiff had failed to satisfy his obligation to produce a film reflecting the Defendant's true life story.  In his Answer, the Defendant asserted a counterclaim for defamation, arising solely out of the allegations contained in paragraph 22 of the Complaint. (Doc. No. 13, pp. 15-17).  Discovery having now closed, the Plaintiff seeks summary judgment in his favor on this counterclaim.

## **STATEMENT OF FACTS**

Plaintiff Paul Castro has been a professional screenwriter and member of the Writer's Guild of America since March of 2000.  (Ex. 1, pp. 6-7).  He received his Masters Degree from UCLA in film and television with a concentration in screenwriting.  (*Id*. p. 7).  He has previously served as a Professor of screenwriting at both UCLA and Elon University.  (*Id*. pp. 34-35).

Castro and Defendant Goggins met through their joint service in the Navy.  (Ex. 2, p. 10). In 2008, Castro and Goggins first discussed doing a movie or book about Goggins' life.  (*Id*. p. 12).  On October 15, 2008, the parties signed an agreement, stating, "This confirms that Paul Castro and David Goggins will partner on the feature film project about David Goggins' life story.  Paul Castro will be the sole screenwriter."  (*Id*. pp. 15-16; Ex. 3).  As Goggins explains,

> Q.     And did you, at that point, agree with Paul Castro that he would do a screenplay and be the sole screenwriter about a – of a screenplay about your life story?
> A.     The letter here, as you see I signed it, but it was my understanding it would be my life story.

(Ex. 2, p. 16).  Goggins acknowledges, in deposition testimony, that he agreed with Castro that Castro was going to be the sole screenwrriter of a movie about his life.  But, Goggins emphasizes, it had to accurately convey his life.  "Like I said before, this right here letter, it says exactly what it says, if it was my life story."  (*Id*. pp. 17-18; 21; 23; 25; 34 [acknowledging that he agreed to let the Plaintiff write his "[t]rue life story"]).

- 2 -

Goggins' defense in this action is that Castro's script did not accurately convey his true life story, as required by the parties' agreement.

> Q. In other words, your objection was that it had to be the truth about your life?
> A. My life story.
> Q. The truth about your life?
> A. The truth about my life.

(*Id.* p. 25). After a 2009 meeting attended by Castro, Goggins, and agents of Overbrook Entertainment, Goggins decided to terminate the rights he gave to Castro after concluding that the script was "70 percent not my life." (*Id.* pp. 34-38). After the meeting, he even called one of the attendees and and told her, "Paul Castro sold that script as my life, it's not my life."[1] (*Id.*) According to Goggins, "most of that stuff in [the script] was not my life." Castro, "sold me on the fact that this is how it needs to be." (*Id.* p. 49 ["that script did not depict my life and I was very uncomfortable with it"]).

This was the end of "Phase One" of the parties' relationship. (*Id.* p. 38). As Goggins explained in deposition, "why am I going to work with you when you went in the room and sold this as my true story." (*Id.* p. 58). "The lie was the script. . . . [T]he script was not my true story." (*Id.* p. 70). "My true story was not what he was writing." (*Id.* p. 73).

In January of 2012, the parties resumed their relationship and Castro sent Goggins another script of the movie. (*Id.* p. 77). By this point, Goggins was ready to "move past bull," which he defines as Castro "lying about my life, selling that script as my life story, which it

---

[1] Goggins acknowledges that, although he had read the script prior to the meeting at Overbrook, as of that meeting he was not insisting on any additional changes to the script. (*Id.* pp. 39, 42). "Q. Well, you concede that you did not ask him to make any changes to the story that he didn't make prior to the Overbrook meeting. Right? A. Oh, yeah, yeah. . . . I told you that." (*Id.* p. 69).

- 3 -

wasn't."[2]  (*Id.* p. 78).  In December of 2014, after Castro sent Goggins yet another draft of the script, Goggins approved the script, telling Castro "that we're good to go, you know, as far as like the script and we can press forward."  (*Id.* p. 105).  At that point, according to Goggins, the parties had a "verbal agreement" that, when the story was presented, it had to be his true life story.  (*Id.* p. 106).

On February 15, 2015, Castro emailed Goggins to tell him that their producer, Lauren Selig, would be asking for an email confirming that Castro is the only person to whom he grants certain rights with respect to his life story.  (*Id.* p. 130).  Goggins replied that he would work on the requested email after class.  (*Id.* p. 132).  On February 18, 2015, Goggins says that his mother replied, at his request, with an email from Goggins' account that stated, in pertinent part:

> Let this serve as a legal document confirming that writer-director Paul Castro is the only person that I grant the right to write and direct the feature film version of my life story and the book version as well. . . . This letter serves as confirmation that Paul Castro is the only person I grant permission to bring my life story to the world via feature film and/or book.  Also, Paul Castro is the only person directing my movie!

(*Id.*, p. 135; Ex. 4).  As Goggins admits, at this point in time he had an agreement with Castro that Castro would be the only person who would write and direct the feature film and book version of his life story.  (Ex. 2, p. 138-139).

According to Goggins, this all changed after a February 25, 2015 meeting at the Gersch Agency.  (*Id.* p. 139).  Goggins, Castro, and other individuals involved in the production of the film attended the meeting.  Goggins acknowledges that, prior to this meeting, he had "approved the script."  However, he contends that he approved the script only with the understanding that

---

[2] Also in 2012, Goggins was engaged in discussions with others about writing his life story, which discussions culminated in a written agreement with another writer, followed by his termination of that agreement.  (*Id.* pp. 82-83).

- 4 -

Castro and Goggins would tell Goggins' "true story" at the meeting. (Ex. 2, p. 113). According to Goggins,

> At the end of the day, I trusted him that when we went to these people, we would tell them my true life. So yes, I agreed on the script, but I trusted him that in this meeting, which is why both meetings didn't work, because he didn't live up to his end of the bargain, which was telling the true story.

(*Id.* p. 114).

During the meeting at the Gersch Agency, Goggins concluded that Castro "once again is doing the same thing he did in the Overbrook meeting." (*Id.* p. 145). A woman at the meeting praised him for something she had read in the script. He corrected her and told her that "that didn't happen." (*Id.* pp. 141-143). What angered Goggins "was the fact that I started realizing we got the meeting [at the Gersch Agency] off of this script that was a lie . . ." (*Id.* p. 143).

> Once I started hearing these questions and I was trying to answer them and I was answering lies in the script, I then said do you know what, this is just ridiculous, this is stupid because I saw myself trying to protect Paul and what he sold to these people and what he sold was not my life . .

(*Id.* p. 144). Immediately after the meeting at the Gersch Agency, Goggins told his mother, "I'm not doing this."[3] (*Id.* p. 112).

Goggins admits that there were things that he specifically asked to be put in the script about his life story, even though they were actually false. (*Id.* p. 74). Goggins also admits that there were scenes in earlier versions of the script that accurately portrayed his life story but that he asked to be removed or altered into something that was not a truthful depiction of his life. (*See, e.g., id.* pp. 61-62).

Goggins' income comes from his retirement, his disability, and occasional speeches. (*Id.* pp. 196-197). He cannot say that anything about this lawsuit has affected his ability to book

---

[3] In deposition, Goggins admits that he never instructed Castro to remove any of these "lies" from the script. (Ex. 2, pp. 127, 129).

speaking engagements. (*Id.* p. 198). "Nobody's come to me and said, hey, you're in a lawsuit . . ." (*Id.*) In fact, no one has ever mentioned to him any of the allegations in the lawsuit. (*Id.* p. 220).

## STATEMENT OF QUESTIONS PRESENTED

1.      Is the Plaintiff entitled to summary judgment on the counterclaim, in light of the Defendant's failure to offer evidence of any injury from the alleged defamatory statements, as required under Tennessee law?

2.      Does the Defendant's contention that the Plaintiff failed to produce a screenplay that accurately portrayed his true life story render the alleged defamatory statements relevant and pertinent to this litigation, thus warranting summary judgment under Tennessee's litigation privilege?

3.      Is the Plaintiff entitled to summary judgment on the counterclaim on the grounds that there is no evidence that would support any conclusion that the alleged defamatory statements were made with the requisite level of fault?

## ARGUMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56, Fed. R. Civ. Proc. Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 393 (4th Cir. 1994),

- 6 -

*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 317, 106 S.Ct. 2548, 2550, 91 L.Ed.2d 265 (1986). Evidence that is merely colorable or that is not significantly probative will not defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-250, 106 S. Ct. 2505, 251, 91 L. Ed. 2d 202 (1986).

Here, the Plaintiff is entitled to summary judgment on the Defendant's defamation counterclaim because: (1) there is no evidence of injury from the alleged defamatory statements, as required under Tennessee law; (2) the Defendant's contention that the Plaintiff failed to produce a screenplay that accurately portrayed his true life story renders the alleged defamatory statements relevant and pertinent to this litigation, thus triggering the litigation privilege; and (3) there is no forecast of evidence that would support any conclusion that the alleged defamatory statements were made with the requisite level of fault.

## A. SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE DEFENDANT HAS FAILED TO OFFER EVIDENCE OF ANY INJURY FROM THE ALLEGED DEFAMATORY STATEMENTS, AS REQUIRED UNDER TENESSEE LAW.

This Court has already held that "Tennessee law should apply to Defendant's defamation claim." (Doc. No. 21, p. 7 [noting that "Defendant is a citizen and resident of Tennessee, thus any form of reputational injury would most likely be centered there"]).

In the Counterclaim, the Defendant contends that the alleged defamatory statements "constitute libel per se, and therefore damages are presumed as a matter of law." (Doc. No. 13, p. 17). However, Tennessee has abolished the distinction between libel per se and libel per quod, noting that it "is no longer a viable" distinction. *Memphis Pub. Co. v. Nichols,* 569 S.W.2d 412, 419 (Tenn. 1978). Instead, under Tennessee law, the counter-claimant "must plead and prove injury from the alleged defamatory words, whether their defamatory meaning be obvious or not."

- 7 -

*Id.*; *see also Pate v. Service Merchandise Co., Inc.*, 959 S.W.2d 569, 574 (Tenn.App. 1996) ("damages must be shown in all defamation cases"); Doc. No. 13, p. 7 ("The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation," *citing Quality Auto Parts Co. v Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994)). The burden is on the counter-claimant to prove damages. *Memphis Pub. Co. v. Nichols*, 569 S.W.2d at 420.

The Defendant asserts in the counterclaim that the alleged defamatory statements had damaged his ability to "seek and obtain engagements as a motivational or inspirational speaker." (Doc. No. 13, p. 15). However, when asked in deposition as to whether anything about this lawsuit has affected the Defendant's ability to generate income through speaking engagements, the Defendant could point to nothing. (Ex. 2, p. 198). In fact, no one has ever even mentioned to him any of the allegations in the lawsuit. (*Id*. p. 220).

Because there is no evidence to support the conclusion that the Defendant has been in any way injured by the alleged defamatory statements, the Defendant has failed to make a showing sufficient to establish the existence of an element essential to his case and upon which he has the burden of proof. Consequently, the Plaintiff is entitled to summary judgment.

## B. THE DEFENDANT'S CONTENTION THAT CASTRO FAILED TO PRODUCE A SCREENPLAY THAT ACCURATELY PORTRAYED HIS TRUE LIFE STORY RENDERS THE ALLEGED DEFAMATORY STATEMENTS RELEVANT AND PERTINENT TO THIS LITIGATION, THUS TRIGGERING THE LITIGATION PRIVILEGE.

Under Tennessee law, "statements made in the course of a judicial proceeding, if pertinent or relevant, are absolutely privileged, and this is true regardless of whether they are malicious, false, known to be false, or against a stranger to the proceeding." *Jones v. Trice*, 360 S.W.2d 54, 50, 210 Tenn. 535, 548 (Tenn. 1962); *see also Simpson Strong-Tie Co., Inc. v.*

- 8 -

*Stewart, Estes & Donnell*, 232 S.W.3d 18, 22 (Tenn. 2007) (explaining history behind the absolute privilege and its early use in Tennessee and noting that "this Court has long accepted the litigation privilege as an important tool in the pursuit of justice"); *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 159 (Tenn.App. 1997) ("Tennessee has long recognized that statements made in the course of judicial proceedings are absolutely privileged"). As the Tennessee Supreme Court has observed,

> Underlying this general doctrine of absolute immunity from liability in libel and slander for statements made in the course of a judicial proceeding is a policy decision by the courts that access to the judicial process, freedom to institute an action, or defend, or participate therein without fear of the burden of being sued for defamation is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of an individual to a legal remedy where he has been wronged thereby.

*Jones v. Trice*, 360 S.W.2d at 51, 210 Tenn. at 541. This "concept is to be liberally construed in order to insure unfettered access to the judicial process." *Bradfield v. Dotson*, 1999 WL 628086, at *4 (Tenn.App. 1999), *quoting Tabor v. Eakin*, 1999 WL 330318, at *3 (Tenn.App. 1999); *see also Myers v. Pickering Firm, Inc.*, 959 S.W.2d at 161 (noting that the Tennessee Supreme Court "strongly endorsed a liberal application of the absolute privilege").

The Tennessee Supreme Court has noted that "the words 'pertinent or relevant' do not mean relevant within the technical rules of evidence." *Id.*, 360 S.W.2d at 54, 210 Tenn. at 547. Instead, "relevant" means "reasonably relevant to the judicial proceedings." *Id.*

> As to the degree of relevancy or pertinency necessary to make alleged defamatory matter privileged, the courts favor a liberal rule. The matter to which the privilege does not extend must be so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevance and impropriety.

*Id.*, 360 S.W.2d at 53-54, 210 Tenn. at 546, *quoting* 33 AM.JUR., Page 146, Section 150.

Goggins admits that, during both the 2008 to 2009 time period and the 2014 to 2015 time period, he had an agreement with Castro, pursuant to which Castro would be the sole

- 9 -

screenwriter of a movie about his life. (Ex. 2, pp. 16, 17-18, 21, 23, 25, 34, 106, 138-139). Goggins' sole explanation for his decision to terminate the relationship – both in 2009 and in 2015 – is that Castro failed to fulfill an alleged obligation to produce a script that depicted Goggins' true life story. (*Id.* pp. 25, 34-38, 49, 58, 70, 73, 113-114, 141-145).

Goggins' defense in this case, as reflected by the testimony cited above, hinges squarely on the issue of whether the script crafted by Castro depicted Goggins' true life. Goggins admits that there were things that he specifically asked to be put in the script about his life story, even though they were actually false. (*Id.* p. 74). He also admits that there were scenes in earlier versions of the script that accurately protrayed his life story but that he asked to be removed or altered into something that was not a truthful depiction of his life. (*See, e.g., id.,* pp. 61-62). If, as the Plaintiff contends, there are facts about Goggins' true life that the Plaintiff discovered that are at variance with the truth as Goggins chose to have it depicted in the screenplay that he expressly approved, then these facts are pertinent and relevant to the claims and defenses in this lawsuit. As a consequence, the allegations relating to those facts are absolutely privileged under Tennessee law.

In short, Goggins cannot have it both ways. He cannot logically argue both that Castro failed to fulfill his obligation to write a screenplay that portrayed his true life story *and* contend that the truth about his life story is "so palpably irrelevant" to the subject matter of this lawsuit that the litigation privilege does not apply. Having chosen to argue that Castro breached an alleged obligation to produce a script that accurately portrayed Goggins' true life story, Goggins must take the bitter with the sweet. He cannot now complain that allegations as to what that true life story entailed are irrelevant.

Because the Defendant's own assertions in this case trigger the relevancy and pertinency of the allegations in paragraph 22 of the Complaint, the litigation privilege applies and the Plaintiff is entitled to summary judgment on the counterclaim.

### C. SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THERE IS NO EVIDENCE THAT WOULD SUPPORT ANY CONCLUSION THAT THE ALLEGED DEFAMATORY STATEMENTS WERE MADE WITH THE REQUISITE LEVEL OF FAULT.

Under Tennessee law, "defamation is not a strict liability tort. To prevail in a defamation cause of action, the plaintiff must also show some level of fault on the part of the defendant." *Pate v. Service Merchandise Co., Inc.*, 959 S.W.2d at 574. Where the defamation claimant is a public figure, he must prove "actual malice" in order to recover for defamation. "The concept of actual malice in defamation cases connotes more than personal ill will, hatred, spite, or desire to injure." *Tomlinson v. Kelley*, 969 S.W.2d 402, 405–06 (Tenn.App. 1997). Instead, the claimant must show that the statements were made "with knowledge that they are false or with reckless disregard to their truth or falsity." *Id.* The burden is upon the claimant to show with "convincing clarity" the facts which make up the "actual malice." *Trigg v. The Elk Valley Times*, 720 S.W.2d 69, 75 (Tenn.App. 1986).

Goggins is a public figure.[4] The term "public figure" includes those who achieve pervasive fame or notoriety. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). Even before becoming a Navy SEAL, Goggins garnered fame and notoriety as a result of his feats of athletic endurance. As he explained, "Since, you know, I was

---

[4] Even if the Court were to determine that Goggins is not a public figure for purposes of the First Amendment, Goggins would still be required to show – at a minimum – that Castro acted negligently in ascertaining the truth or falsity of the statements. *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978); *Pate v. Service Merchandise, Co., Inc.,* 959 S.W.2d at 575. Here, Goggins cannot even sustain this burden.

- 11 -

the guy already out there doing these long races and I already had a lot of publicity, I was pretty much a public figure before I went there so [the Navy] hired me to be a recruiter." (*Id.* pp. 9-10).

According to Goggins, he was

> the face of the SEAL teams and they had me farmed out. I traveled 200-some-odd days a year just telling my life story. So I became a humongous public figure as far as like, you know, my story was out there left and right.

(*Id.* p. 12). He is the subject of a book entitled *Living with a Seal*. (Ex. 2, p. 151). He has done promotional events for the book, including television shows and webcasts. (*Id.*, p. 163). He claims to use his status of public prominence for the purpose of raising money for charitable organizations. (Doc. No 13, p. 11-12). In fact, because of his status as a public figure, he commands fees for public speaking events of $15,000 per hour. (Ex. 2, pp. 183-184).

> As noted by the Tennessee Court of Appeals,
>
> Summary judgments are particularly well-suited for false light and libel claims because the determination concerning whether the plaintiff is a public figure is a question of law, *see Ferguson v. Union City Daily Messenger, Inc.,* 845 S.W.2d 162, 166 (Tenn.1992); *McDowell v. Moore,* 863 S.W.2d 418, 420 (Tenn.Ct.App.1992), as is the determination of whether a public figure has come forward with clear and convincing evidence that the defendant was acting with actual malice.

*Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 283 (Tenn.Ct.App. 2007).

Here, Goggins cannot meet his burden of showing with "convincing clarity" the facts which make up the "actual malice." The evidence is that Goggins himself was the source of the information that gave rise to the allegations in paragraph 22 of the Complaint. Goggins told Castro "many times" that he was not supporting his child, prompting Castro to endeavor unsuccessfully to convince Goggins to allow him to put into the screenplay this aspect of his relationship with his daughter. (Ex. 1, pp. 78-79). It was Goggins himself who told Castro that Goggins was being paid to appear at charity events and thus that not all of the money believed to

have been raised was going exclusivity to charity. (*Id.* p. 82). Because the Defendant cannot meet his burden of showing actual malice, the Plaintiff is entitled to summary judgment on this claim.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Plaintiff respectfully prays the Court to grant the Plaintiff's motion for partial summary judgment.

RESPECTFULLY SUBMITTED, this the 15th day of May, 2017.

**JERRY MEEK, PLLC**

By:    <u>/Gerald F. Meek/</u>        
        GERALD F. MEEK
        N.C. Bar Number 24930
        5950 Fairview Rd., Suite 700
        Charlotte, NC  28105
        Telephone:  704.845.9490
        Fax:  704.837.7056
        <u>jmeek@jerrymeek.com</u>

        Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that on this day I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

> Andrew L. Fitzgerald
> Andy@fitzgeraldlitigation.com
>
> Eric Spengler
> Eric@spengleraganslaw.com

THIS THE 15th day of May, 2017.

**JERRY MEEK, PLLC**

By:    /Gerald F. Meek/_____
        GERALD F. MEEK
        N.C. Bar Number 24930
        5950 Fairview Rd., Suite 700
        Charlotte, NC  28105
        Telephone:  704.845.9490
        Fax:  704.837.7056
        jmeek@jerrymeek.com

        Counsel for the Plaintiff
